AMERICANS UNITED FOR SEPARA-TION OF CHURCH AND STATE, a District of Columbia corporation; Phyllis Ball, Katherine Pieper, Gilbert Davis, Patricia Davis, Frederick L. Schwass and Walter Bergman, Plaintiffs,

v.

The SCHOOL DISTRICT OF the CITY OF GRAND RAPIDS, a Municipal corporation; Phillip Runkel, Superintendent of Public Instruction of the State of Michigan; State Board of Education of the State of Michigan; Loren E. Monroe, State Treasurer of the State of Michigan, Defendants,

Irma Garcia-Aguilar and Simon Aguilar, Bruce and Linda Bylsma, Robert and Penelope Comer, Clarence and Rosalee Covert, Scipuo and Janice Flowers, John and Shirley Leestma, Intervening Defendants.

No. G 80–517.

United States District Court,
W. D. Michigan, S. D.

Aug. 16, 1982.

Albert R. Dilley, Grand Rapids, Mich., for plaintiffs.

Frank J. Kelley, Atty. Gen. by Gerald F. Young, Asst. Atty. Gen., Lansing, Mich., for defendants Superintendent of Public Instruction, State Bd. of Educ. and State Treasurer.

Baxter & Hammond by William S. Farr and John R. Dastema, Grand Rapids, Mich., for defendant Bd. of Educ. of Grand Rapids Schools.

Stuart D. Hubbell, Traverse City, Mich., for intervening defendants.

## MEMORANDUM OPINION

ENSLEN, District Judge.

Asserting transgressions of the Establishment Clause, Plaintiffs seek to enjoin certain cooperative educational arrangements, collectively styled "Shared Time", entered into pursuant to Michigan law by the School District of the City of Grand Rapids and various nonpublic, religiously-oriented, elementary and secondary schools located within, or proximate to, the School District. The challenged programs are conducted by public school teachers in classrooms located

within and leased by nonpublic schools to the public school district. Courses are offered under the supervision and control of the public school district and utilize books and other materials purchased with public funds. Plaintiffs seek a declaration that the Michigan legislature's authorization of funding for these arrangements is violative of the Establishment Clause of the First Amendment of the United States Constitution, as made applicable to the states by the Fourteenth Amendment.[1]

## I. The Parties

There are six individual Plaintiffs and one organizational Plaintiff. The individual Plaintiffs are Phyllis Ball, Katherine Pieper, Gilbert Davis, Patricia Davis, Frederick L. Schwass, and Walter Bergman, each of whom is a resident in Defendant School District, is a Michigan taxpayer, and opposes the use of public funds by nonpublic schools. The organizational Plaintiff, Americans United for Separation of Church and State, is a District of Columbia corporation composed of persons residing and paying taxes throughout the United States, including the State of Michigan.

The original Defendants are the School District of the City of Grand Rapids; Phillip Runkel, Superintendent of Public Instruction of the State of Michigan; State Board of Education of the State of Michigan; and Loren E. Monroe, State Treasurer of the State of Michigan. A number of individuals, parents of children receiving benefits under the challenged programs, were subsequently permitted to intervene as party Defendants.

At the conclusion of trial, Defendants raised, for the first time, the issue of standing, both with regard to the organizational and individual Plaintiffs. Because the matter of standing is jurisdictional and since a federal court must not exercise its awesome injunctive powers in the absence of jurisdiction, I will resolve those issues *seriatim*.

First, Plaintiffs' Complaint, at paragraph 4, states that:

Americans United for Separation of Church and State (hereinafter designated Americans United) is an association of persons resident in the State of Michigan and elsewhere throughout the United States having as its objective to defend, maintain and promote religious liberty and the constitutional principle of separation of church and state. In keeping with this objective, Americans United oppose the use of public funds for the support in whole or in part of sectarian schools or other private schools whose policies and practices are intended to advance and indoctrinate religion.

Paragraph 21 of Plaintiffs' Complaint states:

It is contrary to the religious conscience of each of the Plaintiffs, and is contrary to the purpose for which the organizational Plaintiff was formed, to be forced by operation of the taxing power to contribute to the propagation of religion in the support of religious schools.

With respect to the organizational Plaintiff, there are no further jurisdictional allegations in the Complaint. At trial, no representative of Americans United testified, and indeed, there was no proof that Americans United represent Michigan taxpayers. Thus, the organizational Plaintiff has failed to allege, or prove, taxpayer standing to challenge the validity of the Shared Time program. *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Rather, it appears that Americans United have attempted to assert standing solely on the basis of some "special status" as a representative of those who oppose the use of public funds for the support of religious institutions. Such "special status" standing was considered and expressly rejected, indeed with respect to the very same organizational Plaintiff, in the Supreme Court's recent decision of *Valley Forge Christian College v. Americans United for Separation*

1. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1343(3), 2201 and 2202.

*of Church and State,* —— U.S. ——, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Accordingly, an order dismissing Americans United as Plaintiffs, pursuant to Fed.R.Civ.P. 12(h)(3), will enter this date.[2]

▬ Consequently, I now address the issue of whether the individual Plaintiffs have sustained their burden with respect to standing. Paragraph 5 of Plaintiffs' Complaint reads:

> Each of the individual Plaintiffs is a citizen of the United States and a resident within said school district and pays income taxes and other taxes to the United States and to the State of Michigan and the said school district, and each is a qualified, legal voter registered in the City of Grand Rapids, Kent County, Michigan.

Affidavits were submitted, without objection, by four of the six individual Plaintiffs. Essentially, these affidavits recite that they are citizens of the United States and residents of the Defendant School District who pay federal, state and local taxes, and that they object on the basis of the Establishment Clause to the use of their federal, state and local taxes to support the programs herein challenged. Hence, the individual Plaintiffs have attempted to allege and prove standing to bring the instant action on the basis of their taxpayer status. *Flast v. Cohen, supra,* establishes a two part test:

> The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitu-

tionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. This requirement is consistent with the limitation imposed upon state-taxpayer standing in federal courts in *Doremus v. Board of Education,* 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952). Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art I, § 8. When both nexuses are established, the litigant will have shown a taxpayer's stake in the outcome of the controversy and will be a proper and appropriate party to invoke a federal court's jurisdiction. 392 U.S. at 102–103, 88 S.Ct. at 1953–1954.

Applying that test, I conclude that, like the plaintiff in *Flast,* the individual Plaintiffs satisfy the first part of the test for taxpayer standing. *Flast* limited taxpayer standing to challenges of the exercise of the congressional spending power. As will be developed below, the Michigan legislature's annual appropriation of funding for the Shared Time program is clearly an exercise of its spending power. The individual taxpayers also satisfy the second part of the

---

**2.** What this does to such organizational plaintiffs as NAACP and the Sierra Club is unclear to me. Perhaps organizational plaintiffs ought to allege and prove representation of taxpayers together with the requisite Article I and nexus criteria set forth in *Flast, supra.* It seems altogether archaic as a matter of pleading, and "technical" in terms of proof. Courts of limited jurisdiction must necessarily concern themselves with such matters in order to find or reject jurisdiction. While this should be a mat-

ter of distress to both the Bench and Bar, and especially to the public, it is of no particular moment in this litigation since I find the individual Plaintiffs to enjoy standing. Evidently, an attorney representing an organizational plaintiff is required to be especially wary . . . . This should not be so because it is too reminiscent of the old and discredited formal pleading practice of yesteryear. Moreover, it is silly, and, hence, unjust.

*Flast* test. In other words, the individuals have established the required nexuses between their status as taxpayers and the specific constitutional limitation upon the exercise of the spending power, i.e. the Establishment Clause of the First Amendment to the United States Constitution. For the above reasons, I am satisfied that the individual Plaintiffs do indeed have standing.

## II. The State Legislation

The Michigan legislature, like that of many states, has granted extensive authority over the formulation and control of educational policy to administrative agencies and various bodies at the state and local levels, including some of the defendants to this action. By 1976 P.A. 451, § 1282; M.C.L.A. § 380.1282; M.S.A. § 15.41282, the Michigan legislature provided that:

> The board of a school district shall establish and carry on the grades, schools, and departments it deems necessary or desirable for the maintenance and improvement of the schools, determine the courses of study to be pursued, and cause the pupils attending school in the district to be taught in the schools or departments the board deems expedient.

Pursuant to the above section, the Michigan Supreme Court has determined that local boards of education have discretionary authority to provide shared time instruction to part-time public school students. *Traverse City School District v. Attorney General,* 384 Mich. 390, 411, n. 3, 185 N.W.2d 9 (1971).[3] Moreover, Michigan appellate courts have uniformly held that the provision of shared time instruction by local boards of education on premises leased from nonpublic schools under conditions of public school supervision and control violates neither the United States nor the Michigan Constitutions. *Traverse City School Dis-*

*trict v. Attorney General, supra; Citizens to Advance Public Education v. State Superintendent of Public Instruction,* 65 Mich.App. 168, 237 N.W.2d 232 (1975), *lv. app. den.,* 397 Mich. 854 (1976). *Contra, Americans United for Separation of Church and State v. Porter,* 485 F.Supp. 432 (W.D.Mich.1980).

Local boards of education, including Defendant School District for the City of Grand Rapids, also have statutory authority to lease real and personal property, pursuant to 1976 P.A. 451, § 331(1); M.C.L.A. § 380.331; M.S.A. § 15.4331:

> The school district shall be a body corporate, governed by a board of education; may sue and be sued; and may take, hold, lease, sell, and convey real and personal property, including property outside its corporate limits, and property received by gift, devise, or bequest, as the interest of the school district may require. Land outside the school district shall not be acquired unless approved by a 2/3 vote of members elected to and serving on the board.

In the exercise of its general power to appropriate public funds derived from the Michigan Constitution, the Michigan legislature has authorized the payment of state school aid funds to local boards of education for part-time public school students receiving shared time instruction on premises leased from the nonpublic schools. 1979 P.A. 94, the State School Aid Act of 1979, §§ 6(1) and (2) and 111(3); M.C.L.A. § 388.-1601, *et seq.;* M.S.A. § 15.1919(901), *et seq.* Pursuant to this enactment, the Michigan Department of Education has implemented Administrative Rules R. 340.6 and R 340.7, Administrative Code, 1979, Vol. II, pp. 2732–2733, and "Local District Summary; 1981 Fourth Friday Report". The above statute, the administrative rules, and the reporting forms make no distinction based upon the situs of shared time instruction.

---

**3.** The *Traverse City School District* case arose from a declaratory judgment action to test the validity of the Michigan Attorney General's Opinion, OAG 4715, construing Proposal C as prohibiting the expenditure of public monies for shared time and auxiliary services. For a discussion of the sequence of events by which Proposal C became a part of the Michigan constitution read Justice Adam's Opinion, appearing in 384 Mich. at 437, 185 N.W.2d 9.

Thus, the legislature has authorized payment of state school aid funds without regard to whether shared time instruction occurs on premises owned or leased by the local board of education.[4]

### III. Factual Background

Although the parties, as expected, propose differing interpretations of the facts and urge opposing views of the legal consequences which flow therefrom, the Court, after careful consideration of the entire record, believes that the salient facts underlying this litigation are largely undisputed. The basic facts are set forth below; more detailed facts will be elaborated within that section of the Opinion to which they pertain.

At the outset it should be noted that, throughout this proceeding, the term "shared time" has been used to describe both the Shared Time and the Community Education programs.[5] Individually and collectively both programs have enjoyed a steady growth since their inception. For the 1978–79 school year, there were 9,494 nonpublic school students enrolled in the combined programs; the payment of state school aid funds attributable to those students totalled $1,397,577.20. By the 1981–82 school year, the programs had been extended across county lines, the number of participating nonpublic school students exceeded 11,000, and state aid approached $6,000,000.[6] Besides being offered through the Defendant School District, both programs contain additional common characteristics which will be discussed immediately below. Thereafter, because Shared Time and Community Education are individual and distinct educational programs, they will be discussed separately.

In both the Shared Time and Community Education programs, Defendant School District utilizes a standard form lease to gain access to nonpublic school classrooms and other facilities. The lease specifies a rental charge of $6 per class per week at the elementary schools, and $10 per class per week at the secondary schools. In none of the leases is there any mention of the particular room, space or facility which the instrument governs, and they do not, by their terms, restrict public school employees or students from occupying or using any facility within the nonpublic schools. Indeed, teachers' rooms, libraries, lavatories and similar facilities used in connection with the let premises are generally made available to the School District.

No crucifixes, religious symbols or artifacts may be displayed in leased facilities. Before any nonpublic school facility may be utilized by either of the public school pro-

---

**4.** Michigan state school aid funds are derived primarily from the state sales tax, Mich.Const. art. 4 § 30 and supplemented by an excise tax on spirits, 1979 P.A. 94, § 12; M.C.L.A. § 388.-1612; M.S.A. § 15.1919(912). In the event that there is a deficiency in state school aid funds, monies are then appropriated from the general fund by the legislature. 1981 P.A. 36, § 1; M.C.L.A. § 388.1611; M.S.A. § 15.1919(911). The exact amount of state school aid funds attributable to any shared time program in Michigan is determined by converting, through the use of a complex formula, the number of part-time public school pupils into the comparable number of Full Time Equivalent (FTE) students.

**5.** While Plaintiffs attack the entire Grand Rapids Shared Time program, their attack upon Community Education programs is limited to those portions conducted in facilities rented from nonpublic schools and offered to full time nonpublic school students. Moreover, Plaintiffs stipulated to the dismissal of the Outdoor Education, Drownproofing and Drivers' Education courses from this suit. Furthermore, Plaintiffs suit in no way challenges any aspect of Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. §§ 241a *et seq.*

**6.** For the 1981–82 school year, the Defendant School District received $6 million in state school aid funds for the operation of the Shared Time and Community Education programs. However, those programs operated on a budget of approximately $3 million, leaving the remaining $3 million as "profit" for the School District. Thus, while the Defendants argue pure altruism in extending the challenged programs to nonpublic schools, the "profit" factor reveals an additional motivation.

grams, it is necessary to "desanctify" the facility to ensure that no such symbols are exhibited. In many instances, religious symbols or artifacts, or both, exist in adjoining corridors, surrounding rooms, or other facilities used in connection with the leasehold.

The School District requires its instructors to post signs within the class area designating it as a public school classroom. At least one instructor testified that she carried the "public school" sign with her as she moved throughout the nonpublic schools. There are no signs posted outside of the nonpublic schools indicating that public school courses are being offered therein, or that the facilities serve as a public school annex.

Almost without exception, those students attending Shared Time and Community Education courses in facilities leased from a nonpublic school are the very same students who attend that particular nonpublic school during the regular school day. Thus, there is a virtual identity between students receiving Shared Time or Community Education instruction at any given nonpublic school and the students regularly attending that nonpublic school.

Shared Time and Community Education instruction involves 470 full and part-time teachers. Every Shared Time instructor is employed in accordance with the ordinary hiring procedures adopted by the School District for the City of Grand Rapids. A significant portion of the Shared Time instructors previously taught in nonpublic schools, and many of those had been assigned to the same nonpublic school where they were previously employed. The majority of Community Education offerings on facilities leased from a nonpublic school are taught by instructors employed full time by the very same nonpublic school.

Shared Time is a program wherein the school district offers substantive courses from its general curriculum to nonpublic school students during regular school hours. As noted in *Traverse City School District v.*

*Attorney General, supra,* 384 Mich. at 407, n. 2, 185 N.W.2d 9, such shared time classes have been offered in various Michigan school districts for more than 60 years. In their original form, shared time courses provided public school instruction for nonpublic school pupils at public school sites in subjects widely regarded as being secular. Typical shared time course offerings included mathematics, reading, physical education and art. Perhaps the most striking difference between the Shared Time program at issue, and the prototypical program is that the instant arrangement is conducted *entirely* within the participating nonpublic schools in facilities leased by the School District. This Grand Rapids variation on the shared time arrangement was initiated in 1976, following a Michigan Court of Appeals decision upholding the constitutionality of shared time instruction on leased premises under conditions of public school control. *Citizens to Advance Public Education v. State Superintendent of Public Instruction, supra.*

During the 1981–82 academic year, forty-one private schools participated in the Grand Rapids Shared Time program. With the exception of physical education, industrial arts, music and art, the educational opportunities offered through the program are, in the main, supplementary to the core curriculum of the nonpublic schools. The basic Shared Time course titles include: Art, Music, Physical Education, Industrial Arts, Educational Park, Remedial and Enrichment Mathematics, and Remedial and Enrichment Reading. Various other courses have been offered through Shared Time instruction; they include the following: Humanities, Language Arts, Home Economics, Science, Spanish, French, Latin, Business, Social Studies, Yearbook, Calculus, Creative Writing, Psychology, Journalism, Criminology, and Advanced Biology. The specific courses available through the elementary level Shared Time programs would not otherwise be available in any of the nonpublic schools, and are not required for graduation or progression to the next

grade. The participating private secondary schools, however, require for graduation a course in physical education. Such courses are offered at these schools *only* on a Shared Time basis.

Notwithstanding the numerous Shared Time courses, the amount of time in which the average nonpublic school student receives such instruction is a relatively small portion of that student's total educational experience. There was testimony that ten percent of any given nonpublic school student's time during the academic year would consist of Shared Time instruction. Typically, a nonpublic school student does not participate in every Shared Time course offered at his school.

In the early 1970's, the School District of the City of Grand Rapids instituted the Community Education program in the Grand Rapids Public Schools. Beginning in approximately 1975, that program, which offers to students a diverse array of educational and other enrichment opportunities, was, offered for the first time, at facilities leased from those nonpublic schools which elected to participate. Wherever offered, Community Education courses are taught by Grand Rapids public school employees under the supervision and control of the public schools. Classes offered at nonpublic school sites are now, and have always been, conducted in facilities leased from the participating private institutions.

Unlike Shared Time, the Community Education offerings at issue are scheduled outside of regular school hours. Participating schools, especially those at the elementary level, host "after school" or "leisure time" Community Education courses which, as the name implies, commence at the conclusion of the regular school day. Additionally, at the participating nonpublic high schools, Community Education courses are offered immediately preceding the regular school day, during the "zero hour." Many such "zero hour" classes offer substantive rather than enrichment courses; indeed, certain of the secondary level Community Education

courses may be taken for credit toward graduation. "Zero hour" courses include: Typing, Business Machines, Computer Programming, Photography, Retailing, Communications, Bookkeeping and Astronomy.

Community Education instruction is completely voluntary and will be offered only in the event that twelve or more students are enrolled. Because of this rule of twelve, a well known teacher able to attract students is essential to the establishment of a successful Community Education program. For that reason, and with respect to Community Education only, the School District accords a preference in hiring to instructors already established with students in the building where the nonpublic course will be offered. Currently, there are over 300 Community Education instructors employed on a part-time basis by the School District of the City of Grand Rapids. The majority of those part-time Community Education instructors are employed full time by the situs school, whether public or private. As a consequence, virtually every Community Education course conducted on facilities leased from nonpublic schools has an instructor otherwise employed full time by the same nonpublic school.

Of the nonpublic schools presently participating in the Community Education program, none have ever provided an identical course to their students. In that respect, Community Education courses do not represent substitutes for courses formerly offered at nonpublic schools. Although certain Community Education courses offered at nonpublic school sites are not offered at the public schools on a Community Education basis, all Community Education programs are otherwise available at the public schools, usually as a part of their more extensive regular curriculum.

Finally, because a participating nonpublic school's calendar is not necessarily coterminous with that of the public school's, the Defendant School District has attempted to accommodate the nonpublic schools. For example, it rearranges schedules during re-

ligious holidays not recognized by the public schools. At the elementary level, Community Education courses span a twelve week term of shorter duration than the regular nonpublic school semester. At the secondary level, all Community Education programs generally follow the public school calendar.

### IV. The Nonpublic Schools

■ Approximately forty of the Grand Rapids area nonpublic schools which have elected to participate in the Shared Time and Community Education programs are, by their own admission, "religiously oriented." The challenged programs have, at one time or another, been offered in facilities rented from 28 Roman Catholic schools, 7 Christian schools, 3 Lutheran schools, 1 Seventh Day Adventist school and 1 Baptist school. For purposes of general discussion, most of those schools can be readily divided on the basis of religious affiliation into three categories, to wit: Roman Catholic, Christian, and Lutheran. Plaintiffs introduced abundant evidence tending to demonstrate that a substantial portion of the function of the participating nonpublic schools' "functions are subsumed in the religious mission..." *Hunt v. McNair*, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973).

### A. The Catholic Schools

The elementary and secondary Roman Catholic schools participating in the challenged programs provide their 6,233 students with an opportunity to receive religious instruction. Sister Marie Heyda, author of the book *Catholic Central and West Catholic High Schools*, candidly testified, that the following sentence in her book states the philosophy of education in Catholic schools:

Certainly *religion* and *the values of the spiritual life must always* be an integral part of the atmosphere of the Catholic high school for in the modern age *they*

*are the only reason for its being. Id.* at p. 80. (Emphasis supplied).

The *St. Jude School Parent* Handbook, contains this typical statement of the philosophy of Catholic education:

A God oriented environment which *permeates* the total educational program.

\* \* \* \* \* \*

Opportunities to pray, worship and celebrate as members of a Christian community.

A Christian atmosphere which guides and encourages participation in the church's commitment to social justice.

A continuous development of knowledge of the Catholic faith, its traditions, teachings and theology. (Emphasis supplied).

Each of the Catholic schools is governed by its own Board of Education, normally composed of the pastor and lay members, elected by constituents of the parish with which the school is associated. Although there is no such requirement, nearly all Board members are adherents of the Roman Catholic religion.

Typically, on a daily basis the Catholic schools include some form of prayer or religious observance; on a weekly basis they include actual attendance at religious services. Moreover, the affidavit of Ronald J. Cook, Superintendent of Schools for the Roman Catholic Diocese of Grand Rapids, states at paragraph 21 that: "... It is the policy of the Grand Rapids Catholic schools ordinarily to require students to attend religious instruction classes and religious services either at the Catholic school or at the church of his own faith if the student is not Catholic". No less than 85 percent of the students and 90 percent of the instructors at the combined schools are Catholic.

### B. The Christian Schools

Each of the elementary and secondary Christian schools is operated by the Grand Rapids Christian School Association, an association composed of parents and others

who support Christian education. Membership in the Association is *restricted* to those who *subscribe* to a *doctrinal Basis.* The Basis, which is contained within the Association's Bylaws, provides:

Section 1.3 Basis. The supreme standard of the Association shall be the scriptures of the Old and New Testament, herein confessed to the the [sic] infallible Word of God, as these are interpreted in the historic Reformed confessions: The Belgic Confession, Heidelberg Catechism, and Canons of Dort.

Acknowledging that that [sic] these Scriptures, in instructing us of God, ourselves, and God's creation, contain basic principles authoritative and relevant for education, we hold that:

(a) The authority and responsibility for education (sic) children resides in the parents or guardians of the children and not in the state or the church. Parents, however, may delegate their authority to those who can competently carry out this God-given parental right.

(b) The primary aim of a Christian parent is (sic) securing the education of his child should be to give him a Christian education—that is, an education whose goal is to equip the child for living the Christian life as a member of the Christian community in contemporary society.

(c) Christian parents, when delegating the authority for educating their children, should delegate it to those institutions which seek to provide Christian education for the student.

(d) The responsibility for maintaining such institutions rests on the entire Christian community.

(e) The Christ proclaimed in the infallible Scriptures is the Redeemer and Renewer of our entire life, thus also of our teaching and learning. Consequently in a school which seeks to provide a Christian education it is not sufficient that the teachings of Christianity be a separate subject in the curriculum, but *the Word of God must be an all-prevading force in the educational program.* (Emphasis Supplied).

The Association elects a Board of twelve trustees to operate the schools and make policy decisions. Currently, all twelve trustees are members of the Christian Reformed Church. Article VI of the Bylaws grant to the trustees authority with respect to educational policy:

Section 6.1 Educational Authority. The Board of Trustees of the Association shall have general and plenary authority, oower [sic] and responsibility with respect to the educational policies in its schools, including, without limitation, the following:

(a) To determine and establish the curricula and courses of study to be taught in its schools;

(b) To establish grades and departments in its schools;

(c) To hire and contract with principals, teachers, librarians and other faculity [sic] and staff, and assign such persons to tis [sic] schools;

(d) To specify, purchase and furnish books and other educational materials, supplies and equipment;

\* \* \* \* \* \*

(g) To establish policies for interschool functions and relationships;

(h) To develop, establish and carry into effect plans for the development of Christian education in those areas which are or may be served by the Association.

(i) To make rules and regulations relating in any way to the administrative and educational policies to be followed in its schools.

The evidence established that for the past three school years 88 percent of the students of the Grand Rapids Christian School Association belonged to the Christian Reformed Church or the Reformed Church in America. An informational brochure distributed by Creston-Mayfield Christian

School, a member of the Grand Rapids Christian School Association, relates that: "Christian parents who express their commitment to Christian education are welcome to enroll their children. They will be accepted without regard to race, color, national or ethnic origin." The brochure's conspicuous omission of any reference to "religion" is not inadvertent. Indeed, the application form for admission to the Christian School Association requires the parent to either subscribe to the Basis or to agree to have his children taught according to the Basis principles.

The *Seymour Christian School Staff Handbook,* at section seven, discusses the attributes of a Christian teacher as follows:

### A CHRISTIAN TEACHER

1. A Christian teacher is first of all a servant of his Lord and Savior. His concepts of God, man, and the world find their authority in the Bible. His doctrinal stance requires that he interpret his subject matter from a Christian point of view. His emotional maturity, intellectual competency, and spiritual vibrancy is obvious. His task is to teach God's children about God's world in the light of God's word.

\* \* \* \* \* \*

3. The Christian teacher sees his students as image bearers of God who will be active in His Kingdom now and forever. He will use *every means available* to give his students this perspective. He will be a living example of Christian behavior. He will conspicuously teach Christian virtues. *He will promote a Christian sense of values in his classroom* by teaching respect for authority, respect for the property of others, desire to cooperate, enthusiasm for work, concern for others, and most importantly, submission to the Lordship of Christ. The teacher will be sensitive to his student's academic and spiritual needs. (Emphasis supplied.)

The majority of instructors employed by the Grand Rapids Christian School Association are members of the Christian Reformed Church.

### C. The Lutheran School

The only Lutheran school presently participating in the Shared Time and Community Education programs is Immanuel-St. James Lutheran School. The educational philosophy of that institution is perhaps best expressed in the "Credo on Christian Education" contained within the *Immanuel-St. James Lutheran School Handbook:*

### IMMANUEL–ST. JAMES CREDO ON CHRISTIAN EDUCATION

WE BELIEVE that Christian education is a vital aspect of the Church's mission, commanded by God through the Great Commission.

WE BELIEVE that Christian education is directed toward the total development of people, providing for their spiritual, intellectual, emotional, social and physical needs.

WE BELIEVE that Christian education is a responsibility of all believers toward all people.

WE BELIEVE that the purpose for Christian education is to teach the Christian faith through

(a) instruction in God's word

(b) living in relationships of love and forgiveness.

WE BELIEVE that an effective program of Christian education is based on a distinct theology and determines its curriculum by taking into account current world conditions.

WE BELIEVE that effective education is achieved as quality learning programs relate the Christian faith in every aspect of life.

WE BELIEVE that the family exerts much influence on a child's total education, and that the church must equip adults for their important role in Christian education.

This philosophy is reaffirmed in a section titled: "The Goals of Education", contained in the same booklet which states, in part, that the goals of Lutheran education involve:

1. Leading the child to faith in the Lord Jesus Christ, and keeping him/her in that faith to eternal life in heaven.

2. Helping the child in Christian growth in all relationships of life, such as the family, the Church, the State, the relationship of friendship, of employment and labor, of art and culture.

Immanuel-St. James Lutheran School is a joint effort of the members of Immanuel and St. James Lutheran congregations. The Voters Assemblies of each of these congregations has established a joint Board of Education to direct and conduct the affairs of the school. This joint Board of Education consists of members elected from each participating congregation.

Immanuel-St. James Lutheran School is housed in two separate buildings, located on a site which adjoins a Lutheran church. Prayer and religious instruction are part of the daily curriculum at the school. In addition to the daily formal study of the Lutheran faith and daily devotions, the staff and the pupils assemble on a weekly basis, as well as on days of special religious import, for devotional services. Students in the school are expected to be present during religious instruction and services.

At page 6 of the *Immanuel-St. James Lutheran School Handbook* there appears a section captioned: "Distinctive Features of Immanuel-St. James Lutheran School", which reads:

1. GOD AND HIS WORD ARE CENTRAL.

The Holy Bible influences all lessons and activities in our Christian Day School. Through Scripture the Holy Spirit works to increase the child's understanding of himself, his purpose, his destiny, and his Lord.

2. THE CHILD RECEIVES THROUGH, (sic) SYSTEMATIC IN-STRUCTION IN THE TEACHING OF CHRISTIANITY.

Christian teachers lead the child in daily study of God's word and in prayer and worship. Particular attention is given to clarifying the story of sin and salvation. In addition, the pupil is trained to practice his Christianity. Guided by teachers and fellow pupils, he grows in Christian knowledge, attitude and conduct.

3. THE CHILD RECEIVES A THOROUGH TRAINING IN THE COMMON SCHOOL SUBJECTS.

The child is instructed in all the common school branches of learning, as prescribed by the state. But all such instruction is given from a Christian point of view. The child is thus protected from the dangers of a purely secular schooling.

4. THE CHILD LIVES IN A CHRISTIAN ENVIRONMENT.

The devil constantly seeks to undermine the Christian's faith. The importance of school environment, therefore, is not to be under estimated. True, misunderstandings and incidents of misbehavior and conflict will occur in this school also. But the power of sin is lessened when Christian teachers and children live in intimate relation with their Lord, and in loving concern for one another's growth in holy living.

5. THE CHILD GROWS INTO HIS CHURCH.

More and more active workers in the local congregation and in the church at large are needed. Leaders, pastors, teachers, and lay persons—must be developed to guide the church's work. Members who remain faithful to the Lord, and who are wise stewards of their time, abilities, and possessions, are essential. Immanuel-St. James Lutheran School trains children for just such roles.

With respect to the admission policy, Kraig Johnson, the principal of Immanuel-St. James, candidly admitted that preference is given to members of the Lutheran

faith. In that regard, paragraph 7 of the official admissions policy for the school states:

> 7. Members of the sponsoring congregations are given first opportunity to enroll their children. Children of non-member families are accepted on the following basis and availability of space:
> a) children from sister congregations;
> b) children from other Lutheran churches;
> c) children from other Christian schools;
> d) and others who desire a Christian education.

The effect of that admissions policy on the enrollment of Immanuel-St. James is substantial. Currently, by Mr. Johnson's own estimate, approximately six-sevenths of the students enrollment are Lutheran. Moreover, instructors keep attendance records on church and Sunday school attendance, and perfect church and Sunday school attendance awards are given at the end of each school year.

An individual interested in obtaining a teaching position at Immanuel-St. James Lutheran School must meet stringent requirements. Those are stated concisely at page 8 of the *Immanuel-St. James Lutheran School Handbook:*

> The teachers of Immanuel-St. James Lutheran School meet all the requirements of Synod for its parochial school teachers and the requirements of the State of Michigan, Department of Education. The teachers have pledged themselves to use every opportunity for continued spiritual and professional growth. They are personally interested in the complete welfare of each individual child. Our teachers have always been known to give unselfishly of their time to students and parents who have special needs.

Despite the fact that the evidence revealed several distinguishing features, the character of the participating nonpublic schools is fundamentally and substantially comparable to that of the nonpublic schools involved in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), *reh. den.,* 404 U.S. 876, 92 S.Ct. 24, 30 L.Ed.2d 123 (1971). Based upon the massive testimony and exhibits, the conclusion is inescapable that the religious institutions receiving instructional services from the public schools are sectarian in the sense that a substantial portion of their functions are subsumed in the religious mission. *See also, Committee for Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), *reh. den.,* 422 U.S. 1049, 95 S.Ct. 2668, 45 L.Ed.2d 702 (1975); and *National Coalition for Public Education v. Harris,* 489 F.Supp. 1248, 1262–1267 (SDNY1980), *app. dism.,* 449 U.S. 808, 101 S.Ct. 55, 66 L.Ed.2d 11 (1980), *reh. den.,* 449 U.S. 1028, 101 S.Ct. 601, 66 L.Ed.2d 491 (1980).

### V. The Constitutional Standard

■ The Court's task is to assess the challenged Shared Time and Community Education programs against the limitations imposed by the Establishment Clause of the United States Constitution. The First Amendment states in pertinent part that: "Congress shall make no law respecting the establishment of religion. . . ." This terse prohibition, which is applied to the states through the Due Process Clause of the Fourteenth Amendment, *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), is subject to a decidedly flexible, and constantly evolving interpretation by the courts.[7] Due to the flexible construction of the clause, and in the absence

---

**7.** In a letter to Danberry Baptist Association, dated January 1, 1802, Thomas Jefferson expressed his view as President that: "A wall of separation between church and state" did not permit a national day of fasting. Indeed, there is some reason to speculate that Jefferson may not have agreed with *Cantwell* in later Supreme Court decisions invoking his famous metaphor. Whether I agree with Jefferson or the Supreme Court is of no moment. I must

of rigid, precisely stated constitutional prohibitions, it is necessary to appreciate the primary evils against which it was intended to afford protection: "... sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Commissioner,* 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970).

For many years the Supreme Court has endeavored to fashion guidelines distinguishing permissible from impermissible aid to religious schools. Early in its endeavor, the court placed great emphasis on the concept of neutrality. *See, e.g. Abington School District v. Schempp,* 374 U.S. 203, 215, 83 S.Ct. 1560, 1567, 10 L.Ed.2d 844 (1963). Eventually, this neutrality principle was converted into broader, cumulative criteria. An analysis of this matter cannot begin without careful consideration of those guidelines, a tripartite test, which is clear in expression, if not in operation.

> First, the statute must have a *secular legislative purpose;* second, its principle or *primary effect must be one that neither advances nor inhibits religion, ...;* finally, the statute *must not foster 'an excessive government entanglement with religion.' ... Lemon v. Kurtzman,* 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). (Emphasis supplied.)

Bearing in mind the judicially created flexibility of those criteria, I will proceed to consider the challenged instructional programs in terms of the three tests: purpose, effect, and entanglement.

### A. Purpose

■ The most rudimentary requirement in a constitutional system designed to assure religious independence is that state action at least be justifiable in secular terms. Actions not justifiable in that way will normally violate the Establishment Clause. Although the requirement of a secular purpose is rarely decisive, the requirement did prove decisive in at least one famous case, involving an Arkansas statute adopted to prohibit the teaching in public schools of the theory that man evolved from other species. *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). *See also, Daniel v. Waters,* 515 F.2d 485 (CA 6 1975).

■ The purpose of the Shared Time and Community Education programs are manifestly secular. Inquiry into the purposes of the School District in establishing the programs, and the Michigan legislature in authorizing the necessary funds, provides no basis to form a conclusion that there was any purpose or intent to advance religion unconstitutionally. It is widely recognized that both the state and local governmental bodies will always possess legitimate concerns for obtaining and even upgrading educational systems.[8] The purpose of the Board of Education of the Grand Rapids Public Schools is amply stated in its officially adopted "Philosophy of Education":

> 2. The Grand Rapids Board of Education is committed to provide for each student, an equal opportunity for a quality education.

> Education is an endeavor or process which seeks to develop an excellence of mind, spirit, and attitude of which man is so uniquely capable and having as its ultimate goal the happiness and fulfillment of each individual and the welfare of society.

> The Board recognizes that no two students are alike; they have differing needs, differing abilities, differing aspirations. The Board seeks the fully developed individual, maximizing his potential,

---

adhere to the Supreme Court and its teachings, not Jefferson's. *See,* "Jefferson and the Church-State Wall: A Historical Examination of the Man and the Metaphor", 1978 *Brigham Young University Law Review,* pp. 645–674, for a thorough review of his speculation.

8. Plaintiffs' counsel, referring to the programs as "reverse shared time", conceded during oral arguments that the least vulnerable aspect of the Shared Time and Community Education programs is their purpose.

talents, and interests. The Board is concerned for the exceptional child and will provide opportunities for both the talented and the handicapped.

Education in Grand Rapids Public Schools shall enable each individual to:

A. Acquire the basic skills.

B. Apply rational intellectual processes to the identification, consideration, and solution of problems.

C. Develop a comprehension of a changing body of knowledge of the various disciplines.

D. Learn good health and safety habits as well as muscle coordination.

E. Experience an environment that will motivate and develop an inquisitive mind capable of critical and objective thinking and independent study.

F. Progress toward a marketable skill.

G. Realize the interdependence and the common destiny of all citizens of the United States.

H. Become a citizen who has a sense of self respect, who respects the person and rights of all others, who accepts the responsibilities and disciplines of our society, and who respects the law.

I. Understand and deal with social problems thoughtfully and objectively.

J. Have an opportunity for continuing education.

Education is a cooperative endeavor requiring reciprocal effort on the part of the teacher and students supported by the cooperation of parents and the community.

The Grand Rapids Public Schools shall utilize all available facilities and equipment to provide a healthful and stimulating educational environment. School facilities shall be used for the regular program, continuing education, and the community.

It is exceedingly clear, therefore, that Defendant School District, through its laudable "philosophy", instigated Shared Time and Community Education for purely secular purposes. The State Defendants cannot be said to have had a constitutionally impermissible purpose either. I believe that Jefferson would share the views of Plaintiffs and Defendants on legislative purpose. (See footnote 7). For the foregoing reasons, I find the purpose constitutional.

### B. Primary Effect

■ The second aspect of the constitutional standard requires me to decide whether the "principle or primary effect" of the program is one that "neither advances nor inhibits religion." *Lemon v. Kurtzman,* 403 U.S. at 612, 91 S.Ct. at 2111. Ordinarily, a law which confers a benefit upon all citizens equally, without regard to religious affiliation, will not have a prohibited effect.

It is the contention of Defendants that the Shared Time and Community Education programs fit within the "child benefit principle" in both conception and administration and, thus, do not have the effect of impermissibly advancing religion. *See, Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1971),[9] and *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). The educational programs at issue are certainly consistent with the School District's Philosophy of Education, which is dedicated to the provision of secular educational opportunities for the entire community. There was testimony, and other evidence, presented indicating that both of these cooperative educational arrangements do in fact have a positive impact on the participating nonpublic school students.

Because, as was previously noted, the constitutional standards are flexible by de-

---

**9.** Jefferson's "wall of separation between church and state" was rescued from near-obscurity by Justice Black in *Everson,* citing it as the sole historical justification for his definition

of the Establishment Clause. See especially, 330 U.S. at 15–16, 67 S.Ct. at 511–512, and *Brigham Young Law Review,* footnote 8, *supra.*

sign, what amounts to an impermissible primary effect may best be gleaned by contrasting the "child benefit principle" cases on the one side, with cases finding an impermissible effect on the other.

In *Everson v. Board of Education, supra,* Justice Black, writing for the majority, upheld against an establishment clause attack a New Jersey statute authorizing reimbursement to parents of money expended for bus transportation of their children to and from school, including children attending religious schools. Delivering the opinion he included these comments:

It is true that this Court has, in rare instances, struck down state statutes on the ground that the purpose for which tax-raised funds were to be expended was not a public one. *Citizens' Sav. & L. Asso. v. Topeka,* 20 Wall. (US) 655, 22 L.Ed. 455; *Parkersburg v. Brown,* 106 U.S. 487, 1 S.Ct. 442, 27 L.Ed. 238; *Thompson v. Consolidated Gas Utilities Corp.,* 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510. But the Court has also pointed out that this far-reaching authority must be exercised with the most extreme caution. *Green v. Frazier,* 253 U.S. 233, 240, 40 S.Ct. 499 [501], 64 L.Ed. 878, 881. Otherwise, a state's power to legislate for the public welfare might be seriously curtailed, a power to which is a primary reason for the existence of states. Changing local conditions create new local problems which may lead a state's people and its local authorities to believe that laws authorizing new types of public services are necessary to promote the general well-being of the people. The Fourteenth Amendment did not strip the states of their power to meet problems previously left for individual solution. 330 U.S. at 6–7, 67 S.Ct. at 507.

*Everson* is replete with other references to general public welfare legislation and is considered the seminal point in the development of the "child benefit principle." *See*

also, *Cochran v. Louisiana State Board of Education,* 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930).

More than two decades later, the Supreme Court, in an Opinion by Justice White, reaffirmed the continued vitality of the child benefit principle in *Board of Education v. Allen, supra*[10]. The Court held that a New York statute requiring local public school authorities to lend secular textbooks free of charge to all students in grades 7 through 12, including students attending religious schools, was not infirm under the First Amendment. The holding in *Allen* was premised upon the fact that the books covered only secular subjects, were available to all students, conferred a benefit upon the child's parents rather than upon religious schools, and that ownership of the books remained in the state. The Court concluded that, as in *Everson,* New York was merely "extending the benefits of state laws to all its citizens." 392 U.S. at 242, 88 S.Ct. at 1925.

After *Everson* and *Allen* it is clear that certain limited forms of general welfare state aid may be channeled to pupils attending private schools. In *Walz v. Tax Commissioner, supra,* the traditional tax exemption of property used for religious, educational or charitable purposes was upheld under a similar rationale. *See generally, Americans United for Separation of Church and State v. Blanton,* 433 F.Supp. 97 (M.D. Tenn.), *summ. aff'd.,* 434 U.S. 803, 98 S.Ct. 39, 54 L.Ed.2d 65 (1977).

In contrast to the "child benefit" cases, numerous other cases have invalidated educational programs, after determining that their primary effect impermissibly advanced a sectarian mission. The Supreme Court, in *Committee for Public Education and Religious Liberty v. Nyquist, supra,* invalidated three New York programs, to wit: a maintenance and repair provision, a tuition reimbursement provision, and a tax credit provision. The maintenance and re-

---

**10.** Despite scholarly attack on the Jefferson metaphor, after its use 13 times in *McCollum,* and *Zorach,* Justice Black persisted in using it in this 1968 dissent.

pair provision authorized unrestricted grants, directly to religious schools with the amount depending on the number of pupils. The court found that the undeniable primary effect of those grants was "to subsidize and advance the religious mission of sectarian schools." 413 U.S. at 779–780, 93 S.Ct. at 2968–69. The tuition reimbursement program enabled parents to obtain reimbursement for tuition paid at religious schools. Noting that, in the absence of definite restrictions guaranteeing separation between the secular and the religious functions of the schools, the court held that reimbursement of tuition payments had the effect of providing direct aid to the schools by offering parents an incentive to send their children to such schools. With respect to the tax credit provision, the court also held that it provided a direct incentive to parents.

*Nyquist* attempted to clarify the test for distinguishing the primary from the secondary effects of government programs, which, like the instant matter, have both secular and religious effects. In that respect, the Supreme Court noted: "Our cases simply do not support the notion that a law found to have a 'primary' effect to promote some legitimate end under the State's police power is immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion." 413 U.S. at 783–784, n. 39, 93 S.Ct. at 2970–2971, n. 39. In a sense, *Nyquist* transformed the "primary secular effect" aspect of the constitutional test into a requirement that any non-secular effect be remote, incidental and indirect. Accordingly, this shift in standard compels a rigorous and more searching analysis.

*Sloan v. Lemon,* 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973), *reh. den.* 414 U.S. 881, 94 S.Ct. 30, 38 L.Ed.2d 128 (1973), decided on the same day as *Nyquist,* invalidated a Pennsylvania tuition reimbursement program. The Supreme Court, finding that the Pennsylvania program was indistinguishable from the New York pro-

gram invalidated in *Nyquist,* noted that: ". . . at bottom its intended consequence is to preserve and support religion-oriented institutions." 413 U.S. at 832, 93 S.Ct. at 2986.

*Levitt v. Committee for Public Education and Religious Liberty,* 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973), involved a New York statute authorizing cash reimbursements for the preparation, administration, and grading of certain state-mandated examinations. On direct appeal, the Supreme Court found that the statute violated the primary effect portion of the constitutional standard because it did not effectively restrict the use for which the funds could be put, and because there it did not distinguish between tests which included religious content and tests which were entirely secular.

In 1974, in an attempt to replace the defective aid plan of *Levitt,* the New York legislature enacted another statute that authorized reimbursement to nonpublic schools for the costs of performing state-mandated pupil testing and record keeping. The second statute differed from the first in two important respects: First, the new statute did not reimburse the nonpublic schools for the preparation, administration, or grading of teacher prepared tests. Rather, the tests were prepared by the State of New York. This change was evidently designed to eliminate teacher and administrative discretion which was the subject of criticism by the court in *Levitt.* Secondly, the new statute provided a method for auditing payments made to the school by the state, thereby insuring that reimbursement was made only for actual costs. After a circuitous route through the courts, this second statute was ultimately upheld by the Supreme Court in *Committee for Public Education and Religious Liberty v. Regan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980). Noting the distinctions between the two statutes, the court reasoned that because the nonpublic schools retained no control over the content of the tests or the results thereof, cash reimbursements to pri-

vate schools do not constitute direct aid to religion provided there are "... ample safeguards against excessive or misdirected reimbursement." 444 U.S. at 659, 100 S.Ct. at 849. The court emphasized the following caveat: "Of .course, under the relevant cases the outcome would likely be different *were there no effective means for insuring that the cash reimbursements would cover only secular services.*" 444 U.S. at 659, 100 S.Ct. at 849. (Emphasis supplied.)

In the interim, between the release of *Levitt* and *Regan,* the Supreme Court decided several cases which are important to the present discussion. *Meek v. Pittenger, supra,* involved a challenge to the constitutionality of Pennsylvania statutes authorizing public school authorities to: (1) lend textbooks and instructional material and equipment, and (2) supply professional staff and supportive materials to provide auxiliary services, to qualifying nonpublic schools, many of which maintained religious affiliations. I think *Meek* is germane because the Court, consistent with its decision in *Lemon,* declared unconstitutional a program providing salaries for teachers who supplied secular services to parochial elementary schools. The teachers in *Meek,* however, unlike those in *Lemon,* were hired by the state and were not under the control of the parochial schools. The Court was not convinced by the argument that public school teachers could be self-policing and incapable of being diverted to the advancement of religion. The Court determined that the parochial schools were sectarian and that secular and sectarian activities could not be separated and held that direct subsidy would have the impermissible effect of aiding religion, declaring that:

> We need not decide whether substantial state expenditures to enrich the curricula of church-related elementary and secondary schools, like the expenditure of state funds to support the basic educational program of those schools, necessarily result in the direct and substantial advancement of religious activity. For decisions

of this Court make clear that the District Court erred in relying entirely on the good faith and professionalism of the secular teachers and counselors functioning in church-related schools to ensure that a strictly nonideological posture is maintained.

In *Earley v. DiCenso,* a companion case to *Lemon v. Kurtzman, supra,* the Court invalidated a Rhode Island statute authorizing salary supplements for teachers of secular subjects in nonpublic schools. The Court expressly rejected the proposition, relied upon by the District Court in the case before us, that it was sufficient for the State to assume that teachers in church-related schools would succeed in segregating their religious beliefs from their secular educational duties.

> 'We need not and do not assume that teachers in parochial schools will be guilty of bad faith or any conscious design to evade the limitations imposed by the statute and the First Amendment...
>
> '... But the potential for impermissible fostering of religion is present.... The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion....
>
> 'A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected....' 403 U.S. at 618–619, 91 S.Ct. 2105 [at 2113–2114], 29 L.Ed.2d 745.

The prophylactic contacts required to ensure that teachers play a strictly nonideological role, the Court held, necessarily give rise to a constitutionally intolerable degree of entanglement between church and state. Id., at 619, 91 S.Ct. 2105 [at 2114], 29 L.Ed.2d 745. The same excessive entanglement would be required for Pennsylvania to be 'certain,' as it must be, that Act 194 personnel do not advance the religious mission of the church-related schools in which they serve. *Public*

*Funds for Public Schools v. Marburger,* 358 F.Supp. 29, 40–41, aff'd., 417 U.S. 961, 94 S.Ct. 3163, 41 L.Ed.2d 1134.

That Act 194 authorizes state funding of teachers only for remedial and exceptional students, and not for normal students participating in the core curriculum, does not distinguish this case for *Earley v. DiCenso* and *Lemon v. Kurtzman, supra.* Whether the subject is 'remedial reading,' 'advanced reading,' or simply 'reading,' a teacher remains a teacher, and the danger that religious doctrine will become intertwined with secular instruction persists. The likelihood of inadvertent fostering of religion may be less in a remedial arithmetic class than in a medieval history seminar, but a diminished probability of impermissible conduct is not sufficient: 'The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion.' 403 U.S. at 619, 91 S.Ct. 2105 [at 2114], 29 L.Ed.2d 745. And a state-subsidized guidance counselor is surely as likely as a state-subsidized chemistry teacher to fail on occasion to separate religious instruction and the advancement of religious beliefs from his secular educational responsibilities.

The fact that the teachers and counselors providing auxiliary services are employees of the public intermediate unit, rather than of the church-related schools in which they work, does not substantially eliminate the need for continuing surveillance. To be sure, auxiliary services personnel, because not employed by the nonpublic schools, are not directly subject to the discipline of a religious authority. Cf. *Lemon v. Kurtzman,* 403 U.S. at 618, 91 S.Ct. 2105 [at 2113], 29 L.Ed.2d 745. But they are performing important educational services in schools in which education is an integral part of the dominant sectarian mission and in which an atmosphere dedicated to the advancement of religious belief is constantly maintained. See id., at 618–619, 91 S.Ct. 2105 [at 2113–2114], 29 L.Ed.2d 745. The poten-

tial for impermissible fostering of religion under these circumstances, although somewhat reduced, is nonetheless present. To be certain that auxiliary teachers remain religiously neutral, as the Constitution demands, the State would have to impose limitations on the activities of auxiliary personnel and then engage in some form of continuing surveillance to ensure that those restrictions were being followed. (Footnotes omitted) 421 U.S. at 369–372, 95 S.Ct. at 1765–1767.

Additionally, as is clear from the above quotation, the court held the statute violated the entanglement principle because the state would become excessively entangled with the affairs of religion in order to insure that the teachers furnished by the state did not advance the religion of the parochial schools.

Subsequent to *Meek,* citizens and taxpayers of Ohio filed an action against state and local officials challenging the constitutionality, under the Establishment Clause, of an Ohio statute authorizing a six part program of expenditures that provided various aids to students of nonpublic elementary and secondary schools. Four parts of the program were upheld. *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), involved an appropriation of $88.8 million for various aids to students of nonpublic schools, 96 percent of whom were enrolled in sectarian schools. The Supreme Court sustained the four parts of the program which: (1) provided for the loan of textbooks; (2) paid for the administration of grading standardized achievement tests; (3) provided speech, hearing and psychological diagnostic services on the premises of the nonpublic schools; and, (4) provided "therapeutic services" away from the private school premises. The court held unconstitutional two parts of the legislation which: (1) provided for the loan to private school students of secular instructional equipment and materials comparable to those used in public schools; and (2) paid the expenses of transporting private school

students on field trips. The court struck down the loan of instructional equipment and materials on the explicit rationale that this provision violated the primary effect principle.

An enlightening and valuable comparison can be drawn between two of the programs which the court sustained: the diagnostic services performed on the premises of the private schools and the therapeutic services performed away from private schools. Concluding that the diagnostic services to be performed on the premises of religious schools did not present a substantial danger of advancing religion, the Court stated:

> The reason for considering diagnostic services to be different from teaching or counseling is readily apparent.
>
> First, diagnostic services, unlike teaching or counseling, have little or no educational content and are not closely associated with the educational mission of the nonpublic school. Accordingly, any pressure on the public diagnostician to allow the intrusion of sectarian views is greatly reduced. Second, the diagnostician has only limited contact with the child, and that contact involves chiefly the use of objective and professional testing methods to detect students in need of treatment. The nature of the relationship between the diagnostician and the pupil does not provide the same opportunity for the transmission of sectarian views as attends the relationship between teacher and student or that between counselor and student.
>
> We conclude that providing diagnostic services on the nonpublic school premises will not create an impermissible risk of the fostering of ideological views. It follows that there is no need for excessive surveillance, and there will not be impermissible entanglement. We therefore hold that §§ 3317.06(D) and (F) are constitutional. 433 U.S. at 244, 97 S.Ct. at 2603.

With respect to the provision of therapeutic services to pupils of nonpublic schools,

the Court upheld the program, providing that services were performed at sites other than the nonpublic schools. Contrasting the two programs, the Court made this observation:

> We recognize that, unlike the diagnostician, the therapist may establish a relationship with the pupil in which there might be opportunities to transmit ideological views. In *Meek* the Court acknowledged the danger that publicly employed personnel who provide services analogous to those at issue here might transmit religious instruction and advance religious beliefs in their activities. But, as discussed in Part V, supra, the Court emphasized that this danger arose from the fact that the services were performed in the pervasively sectarian atmosphere of the church-related school. 421 U.S. at 371, 95 S.Ct. 1753 [at 1766], 44 L.Ed.2d 217. See also *Lemon,* 403 U.S., at 618–619, 91 S.Ct. 2105 [at 2113–2114], 29 L.Ed.2d 745. The danger existed there, not because the public employee was likely deliberately to subvert his task to the service of religion, but rather because the pressures of the environment might alter his behavior from its normal course. So long as these types of services are offered at truly religiously neutral locations, the danger perceived in *Meek* does not arise.
>
> The fact that a unit on a neutral site on occasion may serve only sectarian pupils does not provoke the same concerns that troubled the Court in *Meek.*
>
> The influence on a therapist's behavior that is exerted by the fact that he serves a sectarian pupil is qualitatively different from the influence of the pervasive atmosphere of a religious institution. The dangers perceived in *Meek* arose from the nature of the institution, not from the nature of the pupils.
>
> Accordingly, we hold that providing therapeutic and remedial services at a neutral site off the premises of the nonpublic schools will not have the impermissible

effect of advancing religion. Neither will there be any excessive entanglement arising from supervision of public employees to insure that they maintain a neutral stance. It can hardly be said that the supervision of public employees performing public functions on public property creates an excessive entanglement between church and state. Sections 3317.06(G), (H), (I), and (K) are constitutional. 433 U.S. at 247–248, 97 S.Ct. at 2605–2606.

 After a careful search, and comparing the cases, I conclude that services supplied at public expense may be offered on the premises of religious schools provided that the contact with the child and the link to the educational institution are sufficiently limited so as to diminish any danger that the service-provider, who operates under the subtle pressures of the religious atmosphere will be tempted to advance religious views to the children. The decisions indicate that standardized testing and scoring, as well as diagnostic and psychological services may, indeed, be provided on nonpublic school premises. However, state expenditures violate the effect aspect of the constitutional test if such payments are directed to the provision of instructional services for nonpublic school students on premises of schools having religious affiliations.

The Supreme Court has given prominence in several decisions to the level of education offered at religiously affiliated institutions receiving public funds. First, in *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), *reh. den.,* 404 U.S. 874, 92 S.Ct. 25, 30 L.Ed.2d 120 (1971), the Court, sustained legislation providing public funds for the construction of buildings to be used for secular purposes, emphasized differences between colleges on the one hand and elementary and secondary schools on the other:

The 'affirmative if not dominant policy' of the instruction in pre-college church schools is 'to assure future adherents to a particular faith by having control of their total education at an early age.' . . . There is substance to the contention that college students are less impressionable and less susceptible to religious indoctrination. Common observation would seem to support that view, and Congress may well have entertained it. The skepticism of the college student is not an inconsiderable barrier to any attempt or tendency to subvert the congressional objectives and limitations. Furthermore, by their very nature, college and postgraduate courses tend to limit the opportunities for sectarian influence by virtue of their own internal disciplines. Many church-related colleges and universities are characterized by a high degree of academic freedom and seek to evoke free and critical responses from their students. (Citations and footnotes omitted). 403 U.S. at 685–686.

Two years later, in *Hunt v. McNair, supra,* the Supreme Court relied upon *Tilton* in sustaining a legislative system by which a sectarian college was permitted to borrow capital funds at interest rates otherwise available only to the state. *See also, Roemer v. Maryland Public Works Board,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976). Given this distinction, and the fact that the programs *sub judice* are offered at sectarian elementary and secondary schools, the level of scrutiny by which the Court must evaluate the programs is commensurately heightened.

In assessing the instant matter, I observe that the Shared Time and Community Education programs have a number of relevant characteristics in common with the "dual-enrollment" program, which was permanently enjoined by this Court in *Americans United for Separation of Church and State v. Porter, supra.* In each of the programs, a lease was the instrument through which the public school district gained access to nonpublic school facilities. One effect, in both cases, permitted nonpublic school students to attend public school classes without ever leaving the nonpublic school or mixing

with public school students. A second common feature is the complete identity of the student body in the "public school" classes and the nonpublic schools. As in *Porter,* all of the students in Shared Time and Community Education classes are full-time students of the nonpublic schools. Since there are, in fact, no public school students participating in the instant programs, the nonpublic schools are permitted to retain their private religious character. Certainly, there are other similarities and differences between the two programs. However, these two features are significant in that they demonstrate that each of the programs has a constitutionally impermissible effect. *Accord, Americans United For Separation of Church and State v. Oakey,* 337 F.Supp. 545 (D. Vt. 1972); *Americans United For Separation of Church and State v. Paire,* 359 F.Supp. 505 (D. NH. 1973); *Fisher v. Clackamas County School District,* 13 Or. App. 56, 507 P.2d 839 (1973); *Americans United for Separation of Church and State v. Beechwood Independent School District,* 369 F.Supp. 1059 (E.D. Ky. 1974).

In assessing whether the Shared Time program has a sufficiently secular effect, the Court must determine, among other things, whether the class benefited is sufficiently broad. Even when genuinely motivated by an undeniably secular purpose, government must not act so as to support a narrow group of religiously segregated beneficiaries. The challenged programs impact upon a very narrow religious class of beneficiaries. The narrowness of the benefited class was a crucial factor in *Nyquist* in striking down the tax relief program for parents of nonpublic school children where parochial school children composed over 80 percent of the benefited class. Conversely, the breadth of this class has also been a determinative factor in sustaining aid to nonpublic school pupils, particularly at the university level. *Wolman v. Walter, supra.* The Grand Rapids program,

by distinction, directly benefits nonpublic school students, and hence nonpublic schools, while at the same time it excludes members of the public at large. Whereas public school students are assembled at the public facility nearest to their residence, students in religious schools are assembled on the basis of religion without any consideration of residence or school district boundaries. With respect to the exclusion of public from Shared Time classes, a mere statement in the lease that such programs are open to all, does not, as the evidence plainly demonstrated, make the program open to the public.

Despite Defendants' assertions to the contrary, the Court finds that beneficiaries are wholly designated on the basis of religion and, as will be discussed more fully below, the programs as currently implemented also carry with them the destructive potential for political divisiveness. Many of the Shared Time instructors previously taught at the same nonpublic school to which they have now been assigned as public employees. In the Community Education program, the vast majority of instructors are also employed full time by the same nonpublic school. Without questioning the good faith and integrity of the teachers, this Court cannot ignore the potential for advancing religious doctrine under these conditions. Notwithstanding these concerns, a larger problem lies in the fact that challenged courses are conducted in the sectarian atmosphere of the religious schools. As specifically addressed in *Nyquist,* there is a deeper concern that the atmosphere of the schools, rather than actions of the instructors, will have an effect which advances religion. When courses are offered within the abdomen of a sectarian institution to students who are brought together for a religious mission, there is a distinctly impermissible constitutional effect.[11]

Another glaring nonsecular effect of the programs is that financial responsibility for

---

11. *See also,* Justice Powell's concurring Opinion in *Wheeler v. Barrera,* 417 U.S. 402, 428, 94

S.Ct. 2274, 2288, 41 L.Ed.2d 159 (1974), addressing the implementation of the Title I of the

teaching Physical Education, Art, Music and all of the other available course offerings has been transferred from the private religious schools to the taxpayers. By entering into a legalistic agreement with the parochial schools, the public schools have gained more than access to facilities. They have conferred substantial financial benefits upon those religious institutions by employing and paying from tax funds the numerous instructors who teach subjects in the leased classrooms. Without any change in the character of the student body or infusion of any students from other schools, the programs have undeniably rendered direct benefits, both financial and otherwise, to the sectarian institutions. Such an effect is clearly irreconcilable with the dictates of the Establishment Clause.

The relative merit and benefits of the Shared Time and Community Education programs are not issues before the Court. The issue here is whether this composition of students and teachers, when combined in the sectarian atmosphere of a religious school, fosters an impermissible effect under the Establishment Clause. For the reasons discussed herein, I hold that the challenged programs do violate the First Amendment.

### C. The Entanglement Problems

■ Created out of a desire to minimize government intrusion into the realm of religion, the third aspect of the constitutional standard requires that the program under scrutiny must avoid "an excessive govern-

ment entanglement with religion." *Walz v. Tax Commissioner, supra,* 397 U.S. at 674, 90 S.Ct. at 1414. Generally, excessiveness is a question of degree and is often referred to as "administrative entanglement." Some governmental activity that does not have an impermissible religious effect may nevertheless be unconstitutional, if in order to avoid the religious effect government must enter into an arrangement which requires it to monitor the activity. *Lemon v. Kurtzman, supra; Levitt v. Committee for Public Education, supra.*

An additional and somewhat different form of entanglement, "political entanglement", was first enunciated in *Lemon v. Kurtzman, supra:* [12]

A broader base of entanglement of yet a different character is presented by the divisive *political potential* of these state programs. In a community where such a large number of pupils are served by church-related schools, it can be assumed that state assistance will entail considerable political activity. Partisans of parochial schools, understandably concerned with rising costs and sincerely dedicated to both the religious and secular educational missions of their schools, will inevitably champion this cause and promote political action to achieve their goals. Those who oppose state aid, whether for constitutional, religious, or fiscal reasons, will inevitably respond and employ all of the *usual political campaign techniques* to prevail. Candidates will be forced to declare and *voters to choose.* It would be unrealistic to ignore the fact that many

Elementary and Secondary Education Act of 1965, as amended, 20 U.S.C. §§ 241a *et seq*, where he said:

I would have serious misgivings about the constitutionality of a statute that required the utilization of public school teachers in sectarian schools.

**12.** Some of the lawyers have described this standard as a fourth and newer standard. However, it is actually included within the entanglement standard, and, indeed, was included in the *Lemon* opinion. I choose to discuss it before discussing administrative entanglement, since for me, at least, it poses the fundamental

problem: must the government intrude into private religious affairs, whether the churches care or not? One could argue that the church schools are compromising the basis of their existence in their close relationship with the government, and in permitting that government to provide a portion of the educational programs to their schools. Such an issue is, of course, not before me. The issue is whether the Establishment Clause prohibits this relationship even though private schools agree to it.

people confronted with issues of this kind will find their votes aligned with their faith.

Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was to protect. 403 U.S. at 622, 91 S.Ct. at 2115–2116. (Emphasis supplied).

■■■ I have already decided that the educational programs at issue benefit narrow groups of citizens on the basis of religion. Because Grand Rapids is a religiously pluralistic community, there are already religious divisions in that city. In preparation for the March, 1980, school millage campaign, the Grand Rapids Board of Education published *Citizens Handbook Millage '80,* which was distributed as a factual source book to campaign workers. In that booklet the Board of Education has made a purposeful effort to influence favorably the taxpayers sending children to nonpublic schools on the basis of benefits conferred under the programs challenged herein. In attempting to align voters with its cause, the School Board has unquestionably fostered political division along religious lines in disregard of the warnings in *Lemon.* The next Grand Rapids school millage election is scheduled for 1983. Obviously the *potential* for political division on the issue of financial aid to religious schools appears imminent. *Lemon* clearly addresses the problem confronting the parties here:

The *potential* for political divisiveness related to religious beliefs and practice is aggravated in these two statutory programs by the need for continuing annual appropriations and the likelihood of larger and larger demands as costs and populations grow. The Rhode Island District Court found that the parochial school system's 'monumental and deepening financial crisis' would 'inescapably' require larger annual appropriations subsidizing greater percentages of the salaries of lay teachers. Although no facts have been developed in this respect in the Pennsylvania case, it appears that such pressures for expanding aid have already required the state legislature to include a portion of the state revenues from cigarette taxes in the program. 403 U.S. at 623–624, 91 S.Ct. at 2116–2117. (Emphasis supplied).

One can scarcely criticize the Defendant School District. Given the realities of the national and state economies (not to mention the curious Michigan formula for financially supporting its public schools), extra voted millage is the *only* way a school district can keep its school doors open. Obviously, appealing to the voters and importuning them to favorably consider a new millage proposal requires the District to utilize all the persuasion, and all the public relations hyperbole, that it possesses. It is sensible, then, for the district to appeal to those voters who have opted to send their children to private schools. While sensible, it also is a political appeal to the voting community. As such, it invites opposition, as do all political propositions.

In oral argument counsel for Defendant School District urged this Court to consider the fact that, although a potential for political divisiveness might exist, such a division had not occurred. Such an argument ignores the existence of the instant suit and the affidavits of four of the Plaintiffs. Other divisiveness occasioned by the *Citizens Handbook* is only surmise, and such speculation lies without the purview of this Court. Within the ambit of my decision, however, is the inescapable conclusion that such political appeal, as contained in the handbook, creates the *potential* for political division. Such a tendency has long been constitutionally disfavored.

Indeed, the potential for political divisiveness is altogether too evident. The School District "campaigned" (a political ingredient as ancient as politics itself) for a successful millage in 1980, and included the

appeal to the nonpublic school parents. Some candidates for the school board advertised their approval for the millage, including approval of the inclusion of the Shared Time and Community Education programs. This is not a potential for political division but rather historical fact. Voters may also disagree on the issue of the "profitability" of the suspect program. Similarly, the spectre of Board candidates dividing voters over the program haunts the political process.

The potential problems include the 1983 millage election and whether the Board will again appeal to nonpublic school parents. Should one of the Plaintiffs be a school board candidate, that potential becomes a reality.

Defendants further argue that I should ignore the potential for political divisiveness notwithstanding *Lemon, Roemer,* and *Nyquist,* because in the instant case the programs have existed for some time without such division. In summary, they argue that potential can be ignored when the track is smooth. Such an argument applies only to effect, however, and not to the clear teaching of *Lemon* and its progeny with respect to political divisiveness. Indeed, it might be argued that political interference with religion, and its corollary, was the touchstone of the drafters' reasoning in the First Amendment.

Periodic appropriations battles and expanded budgetary demands heighten the threat of political divisiveness resulting from the programs at issue. Therefore, I conclude that both programs create an untenable potential for political division along sectarian lines. While "the prospect of such divisiveness may not alone warrant the invalidation of state laws that otherwise survive the careful scrutiny required by the decision of the Court, it is certainly a 'warn-

ing signal' not to be ignored." *Committee for Public Education v. Nyquist, supra* at 413 U.S. at 794, 93 S.Ct. at 2976.

■ By contrast, forbidden administrative entanglement normally takes the form of excessive government surveillance of religious institutions and personnel. This type of administrative entanglement typically involves the government in policing the expenditures of public monies to insure, as the Establishment Clause requires, that such monies are expended only for secular purposes. An evaluation of administrative entanglement requires me to consider three factors: "(1) the character and purposes of the benefited institutions, (2) the nature of the aid provided, and (3) the resulting relationship between the state and the religious authority." *Roemer v. Maryland Public Works Board,* 426 U.S. at 748, 96 S.Ct. at 2345.

■ As to the character and purpose of the benefited institutions, I have previously concluded that the aided schools, both elementary and secondary, are characterized by substantial religious activity having the primary purpose of advancing religious doctrines. Most, if not all, of the nonpublic schools were located on or near parish churches. The great majority of instructors at those schools are members of the religious faith with which the school is affiliated. This is also true for the great majority of students, all of whom are at an impressionable age. I conclude without hesitation that the purpose of these schools is to advance their particular religions.[13]

Having previously discussed at length the nature of the aid provided, the Court now examines resulting relationship between the state and the religious institutions. The Grand Rapids Public Schools utilized a lease to gain access to facilities within the reli-

---

**13.** That they are pervasively sectarian can be gleaned from the recitation outlined earlier in this Opinion. The fact that they are pervasively sectarian, does not mean that there is a *per se* First Amendment intrusion any more than

not being pervasively sectarian means no intrusion has occurred. It only requires that a court scrutinize carefully the nature of the relationship between the state and such schools.

gious schools participating in the Shared Time and Community Education programs. The director of the Shared Time program testified that he contacts the nonpublic schools that participate in the program to determine which classrooms can be leased. Subsequently, the director visits the nonpublic school building to confer with the Shared Time instructor as to whether the facilities provided are suitable. Pursuant to this arrangement, during the 1981–82 school year rental payments in excess of $200,000 were received by participating nonpublic schools.

I have previously addressed the virtual identity of the student body and the teaching staff. The record also discloses that no evidence was offered by Defendants that any of the participating students come from public schools. As a matter of fact, one witness admitted that a public school student would not be permitted to enroll in a Shared Time class even though that program was "public." Though Defendants claim the Shared Time program is available to all students, the record is abundantly clear that only nonpublic school students wearing the cloak of a "public school student" can enroll in it.

Sharp focus on administrative entanglement reveals that there is considerable duplication between the teachers and staff of the Shared Time program and the nonpublic schools at which their services are rendered. The evidence abundantly demonstrates that many teachers who are employed by a nonpublic school are also employed by the Grand Rapids Public Schools in the Community Education program at the same school. In other instances teachers, now working as Shared Time instructors were previously employed by the nonpublic school at the same building. Teachers working in the sectarian schools, where religion is an integral part of its very purpose, are bound to the advancement of that purpose. As employees of the Grand Rapids Public Schools, those same teachers must discard any expression of the religious values that are otherwise part of the nonpublic schools' reason for existence. Moreover, they must do this within the same building where the normal curriculum is offered, including religion. In essence, nonpublic school teachers employed on a part-time basis by the Grand Rapids Public Schools are required to reverse roles during different times of the day.

The case of Kenneth Zandee is illustrative of the dilemma. Prior to 1977, Zandee was a full-time physical education teacher at Christian High School. In 1977, he entered the employ of the Grand Rapids Public Schools Shared Time program as a full-time physical education teacher assigned to teach at Christian High School. Zandee, thus, returned to Christian High School, this time as a public school employee paid from tax money, to teach the very same subject to the very same Christian High School students. Clearly, during this transition the Grand Rapids Public School had assumed the function of providing physical education courses to the students at Christian High School. To complicate matters further, Zandee also teaches a course called Body Mechanics in the "zero hour" Community Education program conducted at school. Finally, Zandee is also employed by Christian High School, as basketball coach, in both his and the school's private capacities.[14]

■ The case of Mr. Zandee demonstrates the interrelationships which have of

---

**14.** The separation of church and state requirements imposed on Zandee are bizarre to say the least, and unfair to him in the extreme. His whole life has been devoted to his religion and to education within the tenets of his faith. He was educated through college within schools provided by his church. He, as a candid and fair witness, frankly admitted his adherence to the Basis (see earlier discussion) because his children attend the same nonpublic school system in which he taught (still teaches?), and in which he, himself, was educated. That *Basis* to which he earnestly and admiringly was required to submit, as a condition precedent for the education of his own children, must, somehow, be ignored by him during the working day.

Worse, he is the private school basketball coach, utilizing the private school gymnasium for practice and home games. He conducts the

necessity developed between the government and the nonpublic institutions. Likewise, the case of Zandee, and others similarly situated, portrays the real need for monitoring to insure that religious views are not advanced in Shared Time or Community Education programs. Without such monitoring the programs run the risk of enhancing religious views. If the courses are monitored, the programs are still infirm in that an excessive administrative entanglement is necessitated. In either case, the same ultimate result applies and the programs cannot be sustained.

▇▇▇ The Court's finding that the programs breed an excessive administrative entanglement is bolstered by the procedures through which classes and schedules are coordinated for the programs. In order to coordinate the scheduling of 1,500 classes offered by 470 teachers, the Grand Rapids Public Schools take the following steps: Shared Time and Community Education course packets are sent to the participating nonpublic schools. In turn, nonpublic schools reply, indicating which classes they wish to offer. The Director of the Shared Time program then contacts the nonpublic schools to determine which classrooms are available. He then confers with the Shared Time teachers to see if the rooms provided are satisfactory. Additionally, because the academic year calendars of the involved schools is not necessarily coterminous, certain adjustments must be made. One reason the calendars are different relates to religious holidays which the nonpublic schools celebrate. Adjusting schedules creates obvious additional administrative entanglement. Upon closer scrutiny the need to intrude becomes greater as does the assault on the First Amendment. Once entanglement becomes necessary, like a runaway horse, it is hard to corral.

Once the class schedules are set, still more forms of entanglement arise. For example, parents wishing to speak with a Shared Time instructor are encouraged to make an appointment through the nonpublic school's administrative office. It is noteworthy that a great number of the schools publish handbooks which comingle Shared Time and Community Education classes and instructors with those offered exclusively by the nonpublic school. No mention is made of the fact that these teachers are public school employees and the classes are public offerings. Instead, the impression is conveyed that the teachers listed are nonpublic school teachers. Likewise, the courses listed convey the impression that they are offerings of the particular nonpublic school. Additional entanglement problems arise with respect to student discipline, attendance and dress code policies.

The trial record reveals that, indeed, there has been intermingling of public and nonpublic personnel, courses and other ma-

---

suspect programs in the very same gymnasium although they are labeled "public" by the requirements of the Shared Time and the Community Education programs. Ironically, he testified that the "public classroom" placard was on the wall one time, at least, when two religious schools were competing on the hardwood. One wonders what the players and spectators thought. A rational person might have said: "Who is fooling whom"?

The children, of course, are the greater concern. In his capacity as coach, Mr. Zandee testified that his players pray, as indeed his creed requires him to do. However, when those very same students are in the very same gym during the day, and after he has donned his public school hat, they (student and teacher) are forbidden to pray. These youngsters can scarcely be expected to understand the nuance, and neither do I. I grieve for Mr.

Zandee, and his students, who are required to pretend during the day that they are somehow different than they are at night. The state's intrusion on their religious rights, as guaranteed by the other clause of the First Amendment, is onerous.

Mr. Zandee was less than clear in his testimony about what the public school supervisors were looking for when they visited "his" gym and classroom on "many" occasions. If they were there to monitor his secular methods of instruction, there is excessive administrative entanglement. If they were not, the potential for First Amendment violations was excessive, given his peculiar situation.

Either way, Mr. Jefferson's famous "Wall" has crumbled.

terials. It is not unusual for the supervisor of one of the challenged programs to be a teacher, or even the principal, at one of the participating religious schools. Indeed, teachers now on the public school payroll occupy similar positions as before the inception of the programs, with minimal changes in the identity of students or responsibilities. The Public School District is gradually, but surely, taking over an integral function of these religious schools; namely, providing an education to parochial students. As they are currently implemented, it is not difficult to see that both programs are destined to continue expanding numerically, geographically and, most significantly, in terms of the attendant administrative entanglement. For the above reasons, I am compelled to hold that both the Shared Time and the Community Education programs at issue are constitutionally infirm on the basis that they create an excessive administrative entanglement between government and religion.

The Shared Time and Community Education programs established and implemented by the School District for the City of Grand Rapids, through the use of premises leased from various religious schools, violate the Establishment Clause of the United States Constitution because the programs have the primary effect of advancing religion, and because the programs involve an excessive government entanglement with religion. Plaintiffs are entitled to a Permanent Injunction barring further implementation of the programs at issue and the expenditure of public tax monies.

### EPILOGUE

During my tour of seven of the schools last Monday, I was most impressed by both public and private school administrators whom I met. Their sincerity, intelligence, and, above all, their dedication to education, and the children they serve convince me that Grand Rapids is, indeed, fortunate. Much of defense counsel's final argument was addressed to the unique quality and spirit of cooperation existing between the public and private sectors in education and the quality of programing available to all of the children of this community. I agree.

Furthermore, with considerable eloquence and persuasion, he addressed himself to the proposition that, whatever my decision, the nonpublic schools would persevere and would not be forced to close for financial need. Indeed, these schools have long existed in Grand Rapids.

In fact, even before the arguments and the tour, I was not unaware of the outstanding educational opportunities provided by religiously affiliated institutions in this country. Nor was I unaware of the special place that the public schools have been accorded in our American life and history. It is precisely this unique opportunity of choice which mandates that our law, not our sentiments, should chart the distinctions between state and private responsibilities and rights... and, hence, preserve those freedoms which we Americans so deeply treasure.

A court of law in this constitutional democracy is legally bound by a set of deeply rooted, near-inviolate principles. Among the foremost are those which can be gleaned from our First Amendment. Our constitutional delegates sought the advancement of religious and secular freedoms alike by diffusing power in order to insure, among other things, competition among religious sects, as contrasted to dominion by any one. To preserve such freedom, judges take an oath, at the outset of their commissions, to preserve and protect our sacred Constitution. Because public schools are the vehicles which transmit basic lessons and ideals of this nation to our young, our courts have guarded against their use as a religious forum.

In the context of this case alone, as in all litigation, one assumes there are "winners" and "losers." In the constitutional context, however, there are no losers when our Constitution enables us to preserve basic freedoms, even when a particular program is found to be in violation.

Long ago, a French visitor to our young nation, Alexis de Tocqueville, said: "There is hardly a political question in the United States which does not, sooner or later, turn into a judicial one." White, *America in Search of Itself,* Harper and Row; (1982). However he intended this comment, many lament. Indeed, counsel reminded me, during argument, not to exercise the awesome power of injunction lightly. Counsel is correct that injunction is the ultimate power of American justice. White refers to it as the *consultum ultimum.*

While a trial judge ought never to enjoin without the most serious consideration and lengthy contemplation, this power is subject to judicial review. Importantly, the final decision, by whatever court, demonstrates that ours is, indeed, a nation of law. Where freedom is concerned, it must be protected by law, and not by the urgent cry of the majority.

## JUDGMENT

This cause having been tried before the Court sitting without a jury, and the Court having filed its Memorandum Opinion, therein constituting its findings of fact and conclusions of law;

IT IS ORDERED AND ADJUDGED:

1. Those programs established and operated by the School District of the City of Grand Rapids, through the use of premises leased from religious nonpublic schools, are declared violative of the Establishment Clause of the First Amendment to the United States Constitution because the entire Shared Time Program, and those portions of the Community Education Program specifically addressed in the Court's Opinion, have the primary effect of advancing religion, and foster an excessive entanglement with religion.

2. The Defendants herein, and each of them, are permanently enjoined from continuing to operate and conduct the above described programs effective this date.