# SCHOOL DISTRICT OF THE CITY OF GRAND RAPIDS
## ET AL. *v.* BALL ET AL.

No. 83–990.   Argued December 5, 1984—Decided July 1, 1985

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. BURGER, C. J., *post*, p. 398, and O'CONNOR, J., *post*, p. 398, filed opinions concurring in the judgment in part and dissenting in part. WHITE, J., *post*, p. 400, and REHNQUIST, J., *post*, p. 400, filed dissenting opinions.

*Kenneth F. Ripple*, Special Assistant Attorney General of Michigan, argued the cause for petitioners. With him on the briefs were *William S. Farr, John R. Oostema, Stuart D. Hubbell, Frank J. Kelley*, Attorney General, *Louis J. Caruso*, Solicitor General, and *Gerald F. Young*, Assistant Attorney General.

*Michael W. McConnell* argued the cause *pro hac vice* for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Acting Assistant Attorney General Willard, Deputy Solicitor General Bator, Deputy Assistant Attorney General Kuhl, Anthony J. Steinmeyer*, and *Michael Jay Singer*.

*A. E. Dick Howard* argued the cause for respondents. On the brief was *Albert R. Dilley*.*

---

*Briefs of *amici curiae* urging reversal were filed for the National Jewish Commission on Law and Public Affairs (COLPA) by *Nathan Lewin, Dennis Rapps*, and *Daniel D. Chazin;* and for the United States Catholic Conference by *Wilfred R. Caron* and *John A. Liekweg.*

Briefs of *amici curiae* urging affirmance were filed for the American Jewish Congress et al. by *Marc D. Stern, Ronald A. Krauss, Jack D. Novik, Burt Neuborne, Charles S. Sims, Justin Finger*, and *Jeffrey Sinensky;* for Americans United for Separation of Church and State by *Lee Boothby;* and for the Baptist Joint Committee on Public Affairs et al. by *John W. Baker.*

JUSTICE BRENNAN delivered the opinion of the Court.

The School District of Grand Rapids, Michigan, adopted two programs in which classes for nonpublic school students are financed by the public school system, taught by teachers hired by the public school system, and conducted in "leased" classrooms in the nonpublic schools. Most of the nonpublic schools involved in the programs are sectarian religious schools. This case raises the question whether these programs impermissibly involve the government in the support of sectarian religious activities and thus violate the Establishment Clause of the First Amendment.

## I

## A

At issue in this case are the Community Education and Shared Time programs offered in the nonpublic schools of Grand Rapids, Michigan. These programs, first instituted in the 1976–1977 school year, provide classes to nonpublic school students at public expense in classrooms located in and leased from the local nonpublic schools.

The Shared Time program offers classes during the regular schoolday that are intended to be supplementary to the "core curriculum" courses that the State of Michigan requires as a part of an accredited school program. Among the subjects offered are "remedial" and "enrichment" mathematics, "remedial" and "enrichment" reading, art, music, and physical education. A typical nonpublic school student attends these classes for one or two class periods per week; approximately "ten percent of any given nonpublic school student's time during the academic year would consist of Shared Time instruction." *Americans United for Separation of Church and State* v. *School Dist. of Grand Rapids*, 546 F. Supp. 1071, 1079 (WD Mich. 1982). Although Shared Time itself is a program offered only in the nonpublic schools, there was testimony that the courses included in that program are offered, albeit perhaps in a somewhat different form, in the

public schools as well. All of the classes that are the subject of this case are taught in elementary schools, with the exception of Math Topics, a remedial mathematics course taught in the secondary schools.[1]

The Shared Time teachers are full-time employees of the public schools, who often move from classroom to classroom during the course of the schoolday. A "significant portion" of the teachers (approximately 10%) "previously taught in nonpublic schools, and many of those had been assigned to the same nonpublic school where they were previously employed." *Id.*, at 1078. The School District of Grand Rapids hires Shared Time teachers in accordance with its ordinary hiring procedures. *Ibid.* The public school system apparently provides all of the supplies, materials, and equipment used in connection with Shared Time instruction. See App. 341.

The Community Education program is offered throughout the Grand Rapids community in schools and on other sites, for children as well as adults. The classes at issue here are taught in the nonpublic elementary schools and commence at the conclusion of the regular schoolday. Among the courses offered are Arts and Crafts, Home Economics, Spanish, Gymnastics, Yearbook Production, Christmas Arts and Crafts, Drama, Newspaper, Humanities, Chess, Model

---

[1] Shared Time and Community Education courses are taught at the elementary and secondary level in nonpublic schools. However, after the District Court found for respondents and enjoined the further operation of the programs, petitioners did not appeal the decision to the extent that it involved "physical education and industrial arts shared time classes at the secondary level and community education classes at the secondary level." App. 39. Thus, the appeal involved only Shared Time classes at the elementary level, Community Education classes at the elementary level, and the remedial mathematics Shared Time class at the secondary level. *Americans United for Separation of Church and State* v. *School Dist. of Grand Rapids*, 718 F. 2d 1389, 1390 (CA6 1983). These are the only programs whose constitutionality is now before the Court.

Building, and Nature Appreciation. The District Court found that "[a]lthough certain Community Education courses offered at nonpublic school sites are not offered at the public schools on a Community Education basis, all Community Education programs are otherwise available at the public schools, usually as a part of their more extensive regular curriculum." 546 F. Supp., at 1079.

Community Education teachers are part-time public school employees. Community Education courses are completely voluntary and are offered only if 12 or more students enroll. Because a well-known teacher is necessary to attract the requisite number of students, the School District accords a preference in hiring to instructors already teaching within the school. Thus, "virtually every Community Education course conducted on facilities leased from nonpublic schools has an instructor otherwise employed full time by the same nonpublic school." *Ibid.*

Both programs are administered similarly. The Director of the program, a public school employee, sends packets of course listings to the participating nonpublic schools before the school year begins. The nonpublic school administrators then decide which courses they want to offer. The Director works out an academic schedule for each school, taking into account, *inter alia,* the varying religious holidays celebrated by the schools of different denominations.

Nonpublic school administrators decide which classrooms will be used for the programs, and the Director then inspects the facilities and consults with Shared Time teachers to make sure the facilities are satisfactory. The public school system pays the nonpublic schools for the use of the necessary classroom space by entering into "leases" at the rate of $6 per classroom per week. The "leases," however, contain no mention of the particular room, space, or facility leased and teachers' rooms, libraries, lavatories, and similar facilities are made available at no additional charge. *Id.,* at 1077.

Each room used in the programs has to be free of any crucifix, religious symbol, or artifact, although such religious symbols can be present in the adjoining hallways, corridors, and other facilities used in connection with the program. During the time that a given classroom is being used in the programs, the teacher is required to post a sign stating that it is a "public school classroom."[2] However, there are no signs posted outside the school buildings indicating that public school courses are conducted inside or that the facilities are being used as a public school annex.

Although petitioners label the Shared Time and Community Education students as "part-time public school students," the students attending Shared Time and Community Education courses in facilities leased from a nonpublic school are the same students who attend that particular school otherwise. *Id.*, at 1078. There is no evidence that any public school student has ever attended a Shared Time or Community Education class in a nonpublic school. *Id.*, at 1097. The District Court found that "[t]hough Defendants claim the Shared Time program is available to all students, the record is abundantly clear that only nonpublic school students wearing the cloak of a 'public school student' can enroll in it." *Ibid.* The District Court noted that "[w]hereas public school students are assembled at the public facility nearest to their residence, students in religious schools are assembled on the basis of religion without any consideration of residence or school district boundaries." *Id.*, at 1093. Thus, "beneficiaries are wholly designated on the basis of religion," *ibid.*, and these "public school" classes, in contrast to ordinary public

---

[2] The signs read as follows: "GRAND RAPIDS PUBLIC SCHOOLS' ROOM. THIS ROOM HAS BEEN LEASED BY THE GRAND RAPIDS PUBLIC SCHOOL DISTRICT, FOR THE PURPOSE OF CONDUCTING PUBLIC SCHOOL EDUCATIONAL PROGRAMS. THE ACTIVITY IN THIS ROOM IS CONTROLLED SOLELY BY THE GRAND RAPIDS PUBLIC SCHOOL DISTRICT." App. 200.

school classes which are largely neighborhood based, are as segregated by religion as are the schools at which they are offered.[3]

Forty of the forty-one schools at which the programs operate are sectarian in character.[4] The schools of course vary from one another, but substantial evidence suggests that they share deep religious purposes. For instance, the Parent Handbook of one Catholic school states the goals of Catholic education as "[a] God oriented environment which *permeates* the total educational program," "[a] Christian atmosphere which guides and encourages participation in the church's commitment to social justice," and "[a] continuous development of knowledge of the Catholic faith, its traditions, teachings and theology." *Id.*, at 1080. A policy statement of the Christian schools similarly proclaims that "it is not sufficient that the teachings of Christianity be a separate subject in the curriculum, but *the Word of God must be an all-pervading force in the educational program.*" *Id.*, at 1081. These Christian schools require all parents seeking to enroll their children either to subscribe to a particular doctrinal statement or to agree to have their children taught according to the doctrinal statement. The District Court found that the schools are "pervasively sectarian," *id.*, at 1096, n. 13, and concluded "without hesitation that the purposes of these schools is to advance their particular religions," *id.*, at 1096, and that "a substantial portion of their functions are subsumed in the religious mission." *Id.*, at 1084.

---

[3] As would be expected, a large majority of the students attending religious schools belong to the denomination that controls the school. The District Court found, for instance, that approximately 85% of the students at the Catholic schools are Catholic. 546 F. Supp., at 1080.

[4] Twenty-eight of the schools are Roman Catholic, seven are Christian Reformed, three are Lutheran, one is Seventh Day Adventist, and one is Baptist.

## B

Respondents are six taxpayers who filed suit against the School District of Grand Rapids and a number of state officials. They charged that the Shared Time and Community Education programs violated the Establishment Clause of the First Amendment of the Constitution, made applicable to the States through the Fourteenth Amendment. *Everson* v. *Board of Education*, 330 U. S. 1 (1947). After an 8-day bench trial, the District Court entered a judgment on the merits on behalf of respondents and enjoined further operation of the programs.[5]

Applying the familiar three-part purpose, effect, and entanglement test set out in *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), the court held that, although the purpose of the programs was secular, their effect was "distinctly impermissible." 546 F. Supp., at 1093. The court relied in particular on the fact that the programs at issue involved publicly provided instructional services that served nonpublic school students segregated largely by religion on nonpublic school premises. The court also noted that the programs conferred "direct benefits, both financial and otherwise, to the sectarian institutions." *Id.*, at 1094. Finally, the court found that the programs necessarily entailed an unacceptable level of entanglement, both political and administrative, between the

---

[5] Petitioners alleged that respondents lacked taxpayer standing under *Flast* v. *Cohen*, 392 U. S. 83 (1968), and *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464 (1982). The District Court and the Court of Appeals rejected the standing challenge. We affirm this finding, relying on the numerous cases in which we have adjudicated Establishment Clause challenges by state taxpayers to programs for aiding nonpublic schools. See, *e. g.*, *Wolman* v. *Walter*, 433 U. S. 229 (1977); *Roemer* v. *Maryland Public Works Board*, 426 U. S. 736, 744 (1976); *Meek* v. *Pittenger*, 421 U. S. 349, 356–357, n. 6 (1975); *Sloan* v. *Lemon*, 413 U. S. 825 (1973); *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 762 (1973); *Hunt* v. *McNair*, 413 U. S. 734, 735 (1973); *Levitt* v. *Committee for Public Education & Religious Liberty*, 413 U. S. 472, 478 (1973); *Lemon* v. *Kurtzman*, 403 U. S. 602, 608, 611 (1971); *Everson* v. *Board of Education*, 330 U. S. 1, 3 (1947).

public school systems and the sectarian schools. Petitioners appealed the judgment of the District Court to the Court of Appeals for the Sixth Circuit. A divided panel of the Court of Appeals affirmed. *Americans United for Separation of Church and State* v. *School Dist. of Grand Rapids,* 718 F. 2d 1389 (1983). We granted certiorari, 465 U. S. 1064 (1984), and now affirm.

## II

## A

The First Amendment's guarantee that "Congress shall make no law respecting an establishment of religion," as our cases demonstrate, is more than a pledge that no single religion will be designated as a state religion. *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S. 756, 771 (1973); *Lemon* v. *Kurtzman, supra,* at 612; *McGowan* v. *Maryland,* 366 U. S. 420, 442 (1961). It is also more than a mere injunction that governmental programs discriminating among religions are unconstitutional. See, *e. g., Abington School District* v. *Schempp,* 374 U. S. 203, 216–217 (1963); *McCollum* v. *Board of Education,* 333 U. S. 203, 211 (1948). The Establishment Clause instead primarily proscribes "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Nyquist, supra,* at 772; see also *Walz* v. *Tax Comm'n,* 397 U. S. 664, 668 (1970). As Justice Black, writing for the Court in *Everson* v. *Board of Education, supra,* at 15–16, stated: "Neither [a State nor the Federal Government] can pass laws which aid one religion, aid all religions, or prefer one religion over another. . . . No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion."

Since *Everson* made clear that the guarantees of the Establishment Clause apply to the States, we have often grappled with the problem of state aid to nonpublic, religious schools. In all of these cases, our goal has been to give meaning to the sparse language and broad purposes of the

Clause, while not unduly infringing on the ability of the States to provide for the welfare of their people in accordance with their own particular circumstances. Providing for the education of schoolchildren is surely a praiseworthy purpose. But our cases have consistently recognized that even such a praiseworthy, secular purpose cannot validate government aid to parochial schools when the aid has the effect of promoting a single religion or religion generally or when the aid unduly entangles the government in matters religious. For just, as religion throughout history has provided spiritual comfort, guidance, and inspiration to many, it can also serve powerfully to divide societies and to exclude those whose beliefs are not in accord with particular religions or sects that have from time to time achieved dominance. The solution to this problem adopted by the Framers and consistently recognized by this Court is jealously to guard the right of every individual to worship according to the dictates of conscience while requiring the government to maintain a course of neutrality among religions, and between religion and nonreligion. Only in this way can we "make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary" and "sponsor an attitude on the part of government that shows no partiality to any one group and lets each flourish according to the zeal of its adherents and the appeal of its dogma." *Zorach* v. *Clauson,* 343 U. S. 306, 313 (1952).

We have noted that the three-part test first articulated in *Lemon* v. *Kurtzman, supra,* at 612–613, guides "[t]he general nature of our inquiry in this area," *Mueller* v. *Allen,* 463 U. S. 388, 394 (1983):

> "Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary

effect must be one that neither advances nor inhibits religion, *Board of Education* v. *Allen*, 392 U. S. 236, 243 (1968); finally, the statute must not foster 'an excessive government entanglement with religion.' *Walz* [v. *Tax Comm'n*, 397 U. S., at 674]." *Lemon* v. *Kurtzman*, 403 U. S., at 612–613.

These tests "must not be viewed as setting the precise limits to the necessary constitutional inquiry, but serve only as guidelines with which to identify instances in which the objectives of the Establishment Clause have been impaired." *Meek* v. *Pittenger*, 421 U. S. 349, 359 (1975). We have particularly relied on *Lemon* in every case involving the sensitive relationship between government and religion in the education of our children. The government's activities in this area can have a magnified impact on impressionable young minds, and the occasional rivalry of parallel public and private school systems offers an all-too-ready opportunity for divisive rifts along religious lines in the body politic. See *Committee for Public Education & Religious Liberty* v. *Nyquist, supra,* at 796–798; *Lemon* v. *Kurtzman, supra,* at 622–624. The *Lemon* test concentrates attention on the issues—purposes, effect, entanglement—that determine whether a particular state action is an improper "law respecting an establishment of religion." We therefore reaffirm that state action alleged to violate the Establishment Clause should be measured against the *Lemon* criteria.

As has often been true in school aid cases, there is no dispute as to the first test. Both the District Court and the Court of Appeals found that the purpose of the Community Education and Shared Time programs was "manifestly secular." 546 F. Supp., at 1085; see also 718 F. 2d, at 1398. We find no reason to disagree with this holding, and therefore go on to consider whether the primary or principal effect of the challenged programs is to advance or inhibit religion.

## B

Our inquiry must begin with a consideration of the nature of the institutions in which the programs operate. Of the 41 private schools where these "part-time public schools" have operated, 40 are identifiably religious schools. It is true that each school may not share all of the characteristics of religious schools as articulated, for example, in the complaint in *Meek* v. *Pittenger, supra,* at 356; see also *Lemon* v. *Kurtzman, supra,* at 615. The District Court found, however, that "[b]ased upon the massive testimony and exhibits, the conclusion is inescapable that the religious institutions receiving instructional services from the public schools are sectarian in the sense that a substantial portion of their functions are subsumed in the religious mission." 546 F. Supp., at 1084; see *Hunt* v. *McNair,* 413 U. S. 734, 735 (1973); *Meek* v. *Pittenger, supra,* at 366 ("The very purpose of many of those schools is to provide an integrated secular and religious education"); *Walz* v. *Tax Comm'n,* 397 U. S., at 671 ("to assure future adherents to a particular faith" is "an affirmative if not dominant policy of church schools"). At the religious schools here—as at the sectarian schools that have been the subject of our past cases—"the secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within that institution, the two are inextricably intertwined." [6] *Lemon* v. *Kurtzman, supra,* at 657 (opinion of BRENNAN, J.). See also *Meek* v. *Pittenger, supra,* at 365–366; *Board of Education* v. *Allen,* 392 U. S. 236, 245, 247–248 (1968).

---

[6] The elementary and secondary schools in this case differ substantially from the colleges that we refused to characterize as "pervasively sectarian" in *Roemer* v. *Maryland Public Works Board,* 426 U. S., at 755–759. See also *Hunt* v. *McNair,* 413 U. S. 734 (1973); *Tilton* v. *Richardson,* 403 U. S. 672 (1971). Many of the schools in this case include prayer and attendance at religious services as a part of their curriculum, are run by churches or other organizations whose members must subscribe to particular religious tenets, have faculties and student bodies composed largely of adherents of the particular denomination, and give preference in attendance to children belonging to the denomination. 546 F. Supp., at 1080–1084.

Given that 40 of the 41 schools in this case are thus "pervasively sectarian," the challenged public school programs operating in the religious schools may impermissibly advance religion in three different ways. First, the teachers participating in the programs may become involved in intentionally or inadvertently inculcating particular religious tenets or beliefs. Second, the programs may provide a crucial symbolic link between government and religion, thereby enlisting—at least in the eyes of impressionable youngsters—the powers of government to the support of the religious denomination operating the school. Third, the programs may have the effect of directly promoting religion by impermissibly providing a subsidy to the primary religious mission of the institutions affected.

(1)

Although Establishment Clause jurisprudence is characterized by few absolutes, the Clause does absolutely prohibit government-financed or government-sponsored indoctrination into the beliefs of a particular religious faith. See *Stone* v. *Graham,* 449 U. S. 39 (1980) *(per curiam); Meek* v. *Pittenger, supra,* at 370; *Lemon* v. *Kurtzman, supra,* at 619 ("The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion"); *Levitt* v. *Committee for Public Education & Religious Liberty,* 413 U. S. 472, 480 (1973) ("[T]he State is constitutionally compelled to assure that the state-supported activity is not being used for religious indoctrination"); *Engel* v. *Vitale,* 370 U. S. 421, 429 (1962); *Zorach* v. *Clauson,* 343 U. S., at 314 ("Government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education . . ."). Such indoctrination, if permitted to occur, would have devastating effects on the right of each individual voluntarily to determine what to believe (and what not to believe) free of any coercive pressures from the State, while at the same time tainting the resulting religious beliefs with a corrosive secularism.

In *Meek* v. *Pittenger*, 421 U. S. 349 (1975), the Court invalidated a statute providing for the loan of state-paid professional staff—including teachers—to nonpublic schools to provide remedial and accelerated instruction, guidance counseling and testing, and other services on the premises of the nonpublic schools. Such a program, if not subjected to a "comprehensive, discriminating, and continuing state surveillance," *Lemon* v. *Kurtzman*, 403 U. S., at 619 (quoted in *Meek, supra*, at 370), would entail an unacceptable risk that the state-sponsored instructional personnel would "advance the religious mission of the church-related schools in which they serve." *Meek*, 421 U. S., at 370. Even though the teachers were paid by the State, "[t]he potential for impermissible fostering of religion under these circumstances, although somewhat reduced, is nonetheless present." *Id.*, at 372. The program in *Meek*, if not sufficiently monitored, would simply have entailed too great a risk of state-sponsored indoctrination.

The programs before us today share the defect that we identified in *Meek*. With respect to the Community Education program, the District Court found that "virtually every Community Education course conducted on facilities leased from nonpublic schools has an instructor otherwise employed full time by the same nonpublic school." 546 F. Supp., at 1079. These instructors, many of whom no doubt teach in the religious schools precisely because they are adherents of the controlling denomination and want to serve their religious community zealously, are expected during the regular schoolday to inculcate their students with the tenets and beliefs of their particular religious faiths. Yet the premise of the program is that those instructors can put aside their religious convictions and engage in entirely secular Community Education instruction as soon as the schoolday is over. Moreover, they are expected to do so before the same religious school students and in the same religious school classrooms that they employed to advance religious purposes

during the "official" schoolday. Nonetheless, as petitioners themselves asserted, Community Education classes are not specifically monitored for religious content. App. 353.

We do not question that the dedicated and professional religious school teachers employed by the Community Education program will attempt in good faith to perform their secular mission conscientiously. Cf. *Lemon, supra,* at 618–619. Nonetheless, there is a substantial risk that, overtly or subtly, the religious message they are expected to convey during the regular schoolday will infuse the supposedly secular classes they teach after school. The danger arises "not because the public employee [is] likely deliberately to subvert his task to the service of religion, but rather because the pressures of the environment might alter his behavior from its normal course." *Wolman* v. *Walter,* 433 U. S. 229, 247 (1977). "The conflict of functions inheres in the situation." *Lemon* v. *Kurtzman, supra,* at 617.

The Shared Time program, though structured somewhat differently, nonetheless also poses a substantial risk of state-sponsored indoctrination. The most important difference between the programs is that most of the instructors in the Shared Time program are full-time teachers hired by the public schools. Moreover, although "virtually every" Community Education instructor is a full-time religious school teacher, 546 F. Supp., at 1079, only "[a] significant portion" of the Shared Time instructors previously worked in the religious schools.[7] *Id.,* at 1078. Nonetheless, as with the Community Education program, no attempt is made to monitor the Shared Time courses for religious content. App. 330.[8]

---

[7] Approximately 10% of the Shared Time instructors were previously employed by the religious schools, and many of these were reassigned back to the school at which they had previously taught.

[8] The public school system does include Shared Time teachers in its ordinary teacher evaluation program, which subjects them to evaluation once each year during their first year of teaching and once every three years after that. App. 54, 330.

Thus, despite these differences between the two programs, our holding in *Meek* controls the inquiry with respect to Shared Time, as well as Community Education. Shared Time instructors are teaching academic subjects in religious schools in courses virtually indistinguishable from the other courses offered during the regular religious schoolday. The teachers in this program, even more than their Community Education colleagues, are "performing important educational services in schools in which education is an integral part of the dominant sectarian mission and in which an atmosphere dedicated to the advancement of religious belief is constantly maintained." *Meek* v. *Pittenger*, 421 U. S., at 371. Teachers in such an atmosphere may well subtly (or overtly) conform their instruction to the environment in which they teach, while students will perceive the instruction provided in the context of the dominantly religious message of the institution, thus reinforcing the indoctrinating effect. As we stated in *Meek*, "[w]hether the subject is 'remedial reading,' 'advanced reading,' or simply 'reading,' a teacher remains a teacher, and the danger that religious doctrine will become intertwined with secular instruction persists." *Id.*, at 370. Unlike types of aid that the Court has upheld, such as state-created standardized tests, *Committee for Public Education & Religious Liberty* v. *Regan*, 444 U. S. 646 (1980), or diagnostic services, *Wolman* v. *Walter*, *supra*, at 241–244, there is a "substantial risk" that programs operating in this environment would "be used for religious educational purposes." *Committee for Public Education & Religious Liberty* v. *Regan*, *supra*, at 656.

The Court of Appeals of course recognized that respondents adduced no evidence of specific incidents of religious indoctrination in this case. 718 F. 2d, at 1404. But the absence of proof of specific incidents is not dispositive. When conducting a supposedly secular class in the pervasively sectarian environment of a religious school, a teacher may knowingly or unwillingly tailor the content of the course to fit the school's announced goals. If so, there is no reason to believe

that this kind of ideological influence would be detected or reported by students, by their parents, or by the school system itself. The students are presumably attending religious schools precisely in order to receive religious instruction. After spending the balance of their schoolday in classes heavily influenced by a religious perspective, they would have little motivation or ability to discern improper ideological content that may creep into a Shared Time or Community Education course. Neither their parents nor the parochial schools would have cause to complain if the effect of the publicly supported instruction were to advance the schools' sectarian mission. And the public school system itself has no incentive to detect or report any specific incidents of improper state-sponsored indoctrination. Thus, the lack of evidence of specific incidents of indoctrination is of little significance.

(2)

Our cases have recognized that the Establishment Clause guards against more than direct, state-funded efforts to indoctrinate youngsters in specific religious beliefs. Government promotes religion as effectively when it fosters a close identification of its powers and responsibilities with those of any—or all—religious denominations as when it attempts to inculcate specific religious doctrines. If this identification conveys a message of government endorsement or disapproval of religion, a core purpose of the Establishment Clause is violated. See *Lynch* v. *Donnelly*, 465 U. S. 668, 688 (1984) (O'CONNOR, J., concurring); cf. *Abington School District* v. *Schempp*, 374 U. S., at 222 (history teaches that "powerful sects or groups might bring about a fusion of governmental and religious functions or a concert or dependency of one upon the other to the end that official support of the State or Federal Government would be placed behind the tenets of one or of all orthodoxies"). As we stated in *Larkin* v. *Grendel's Den, Inc.*, 459 U. S. 116, 125–126 (1982): "[T]he mere appearance of a joint exercise of legislative authority by Church and State provides a significant symbolic benefit to

religion in the minds of some by reason of the power conferred." See also *Widmar* v. *Vincent*, 454 U. S. 263, 274 (1981) (finding effect "incidental" and not "primary" because it "does not confer any imprimatur of state approval on religious sects or practices").

It follows that an important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices. The inquiry into this kind of effect must be conducted with particular care when many of the citizens perceiving the governmental message are children in their formative years.[9] Cf. *Widmar* v. *Vincent, supra,* at 274; *Tilton* v. *Richardson,* 403 U. S. 672, 685–686 (1971). The symbolism of a union between church and state is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as of free and voluntary choice.

Our school-aid cases have recognized a sensitivity to the symbolic impact of the union of church and state. Grappling with problems in many ways parallel to those we face today, *McCollum* v. *Board of Education,* 333 U. S. 203 (1948), held that a public school may not permit part-time religious instruction on its premises as a part of the school program, even if participation in that instruction is entirely voluntary and even if the instruction itself is conducted only by nonpubic school personnel. Yet in *Zorach* v. *Clauson,* 343 U. S.

---

[9] For instance, this Court has held that prayers conducted at the commencement of a legislative session do not violate the Establishment Clause, in part because of long historical usage and lack of particular sectarian content. *Marsh* v. *Chambers,* 463 U. S. 783, 795 (1983). But we have never indulged a similar assumption with respect to prayers conducted at the opening of the schoolday. *Abington School District* v. *Schempp,* 374 U. S. 203 (1963); *Engel* v. *Vitale,* 370 U. S. 421 (1962).

306 (1952), the Court held that a similar program conducted off the premises of the public school passed constitutional muster. The difference in symbolic impact helps to explain the difference between the cases. The symbolic connection of church and state in the *McCollum* program presented the students with a graphic symbol of the "concert or union or dependency" of church and state, see *Zorach, supra,* at 312. This very symbolic union was conspicuously absent in the *Zorach* program.[10]

In the programs challenged in this case, the religious school students spend their typical schoolday moving between religious school and "public school" classes. Both types of classes take place in the same religious school building and both are largely composed of students who are adherents of the same denomination. In this environment, the students would be unlikely to discern the crucial difference between the religious school classes and the "public school" classes, even if the latter were successfully kept free of religious indoctrination. As one commentator has written:

> "This pervasive [religious] atmosphere makes on the young student's mind a lasting imprint that the holy and transcendental should be central to all facets of life. It increases respect for the church as an institution to guide one's total life adjustments and undoubtedly helps stimulate interest in religious vocations. . . . In short, the parochial school's total operation serves to fulfill both secular and religious functions concurrently, and the two cannot be completely separated. Support of any part of its activity entails some support of the disqualifying religious function of molding the religious personality

---

[10] Compare *Meek* v. *Pittenger,* 421 U. S., at 367–373 (invalidating program providing for state-funded remedial services on religious school premises), with *Wolman* v. *Walter,* 433 U. S., at 244–248 (upholding program providing for similar services at neutral sites off the premises of the religious school).

of the young student." Giannella, Religious Liberty, Nonestablishment and Doctrinal Development: Part II. The Nonestablishment Principle, 81 Harv. L. Rev. 513, 574 (1968).

Consequently, even the student who notices the "public school" sign [11] temporarily posted would have before him a powerful symbol of state endorsement and encouragement of the religious beliefs taught in the same class at some other time during the day.

As Judge Friendly, writing for the Second Circuit in the companion case to the case at bar, stated:

> "Under the City's plan public school teachers are, so far as appearance is concerned, a regular adjunct of the religious school. They pace the same halls, use classrooms in the same building, teach the same students, and confer with the teachers hired by the religious schools, many of them members of religious orders. The religious school appears to the public as a joint enterprise staffed with some teachers paid by its religious sponsor and others by the public." *Felton* v. *Secretary, United States Dept. of Ed.,* 739 F. 2d 48, 67–68 (1984).

This effect — the symbolic union of government and religion in one sectarian enterprise—is an impermissible effect under the Establishment Clause.

### (3)

In *Everson* v. *Board of Education,* 330 U. S. 1 (1947), the Court stated that "[n]o tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." *Id.,* at 16. With but one exception, our subsequent cases have struck down attempts by States to make payments out of public tax dollars

---

[11] See n. 2, *supra.*

directly to primary or secondary religious educational institutions. See, *e. g.*, *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S., at 774–781 (reimbursement for maintenance and repair expenses); *Levitt* v. *Committee for Public Education & Religious Liberty*, 413 U. S. 472 (1973) (reimbursement for teacher-prepared tests); *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971) (salary supplements for nonpublic school teachers). But see *Committee for Public Education & Religious Liberty* v. *Regan*, 444 U. S. 646 (1980) (permitting public subsidy for certain routinized recordkeeping and testing services performed by nonpublic schools but required by state law).

Aside from cash payments, the Court has distinguished between two categories of programs in which public funds are used to finance secular activities that religious schools would otherwise fund from their own resources. In the first category, the Court has noted that it is "well established . . . that not every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon religious institutions is, for that reason alone, constitutionally invalid." *Committee for Public Education & Religious Liberty* v. *Nyquist, supra,* at 771; *Roemer* v. *Maryland Public Works Board,* 426 U. S. 736, 747 (1976); *Hunt* v. *McNair,* 413 U. S., at 742–743. In such "indirect" aid cases, the government has used primarily secular means to accomplish a primarily secular end, and no "primary effect" of advancing religion has thus been found. On this rationale, the Court has upheld programs providing for loans of secular textbooks to nonpublic school students, *Board of Education* v. *Allen,* 392 U. S. 236 (1968); see also *Wolman* v. *Walter,* 433 U. S., at 236–238; *Meek* v. *Pittenger,* 421 U. S., at 359–362, and programs providing bus transportation for nonpublic school children, *Everson* v. *Board of Education, supra.*

In the second category of cases, the Court has relied on the Establishment Clause prohibition of forms of aid that provide "direct and substantial advancement of the sectarian enterprise." *Wolman* v. *Walter, supra,* at 250. In such "direct

aid" cases, the government, although acting for a secular purpose, has done so by directly supporting a religious institution. Under this rationale, the Court has struck down state schemes providing for tuition grants and tax benefits for parents whose children attend religious school, see *Sloan* v. *Lemon*, 413 U. S. 825 (1973); *Committee for Public Education & Religious Liberty* v. *Nyquist, supra,* at 780–794, and programs providing for "loan" of instructional materials to be used in religious schools, see *Wolman* v. *Walter, supra,* at 248–251; *Meek* v. *Pittenger, supra,* at 365. In *Sloan* and *Nyquist,* the aid was formally given to parents and not directly to the religious schools, while in *Wolman* and *Meek,* the aid was in-kind assistance rather than the direct contribution of public funds. Nonetheless, these differences in form were insufficient to save programs whose effect was indistinguishable from that of a direct subsidy to the religious school.

Thus, the Court has never accepted the mere possibility of subsidization, as the above cases demonstrate, as sufficient to invalidate an aid program. On the other hand, this effect is not wholly unimportant for Establishment Clause purposes. If it were, the public schools could gradually take on themselves the entire responsibility for teaching secular subjects on religious school premises. The question in each case must be whether the effect of the proffered aid is "direct and substantial," *Committee for Public Education & Religious Liberty* v. *Nyquist, supra,* at 784–785, n. 39, or indirect and incidental.[12] "The problem, like many problems in constitutional law, is one of degree." *Zorach* v. *Clauson,* 343 U. S., at 314.

---

[12] This "indirect subsidy" effect only evokes Establishment Clause concerns when the public funds flow to "an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission . . . ." *Hunt* v. *McNair,* 413 U. S., at 743. In this case, the District Court explicitly found that 40 of the 41 participating nonpublic schools were pervasively religious in this sense. 546 F. Supp., at 1080. For this reason, the inquiry into whether the aid is "direct and substantial" is necessary.

We have noted in the past that the religious school has dual functions, providing its students with a secular education while it promotes a particular religious perspective. See *Mueller* v. *Allen*, 463 U. S., at 401–402; *Board of Education* v. *Allen, supra*. In *Meek* and *Wolman*, we held unconstitutional state programs providing for loans of instructional equipment and materials to religious schools, on the ground that the programs advanced the "primary, religion-oriented educational function of the sectarian school." *Meek, supra,* at 364; *Wolman, supra,* at 248–251. Cf. *Wolman, supra,* at 243 (upholding provision of diagnostic services, which were "'general welfare services for children that may be provided by the State regardless of the incidental benefit that accrues to church-related schools,'" quoting *Meek, supra,* at 371, n. 21). The programs challenged here, which provide teachers in addition to the instructional equipment and materials, have a similar—and forbidden—effect of advancing religion. This kind of direct aid to the educational function of the religious school is indistinguishable from the provision of a direct cash subsidy to the religious school that is most clearly prohibited under the Establishment Clause.

Petitioners claim that the aid here, like the textbooks in *Allen*, flows primarily to the students, not to the religious schools.[13] Of course, all aid to religious schools ultimately "flows to" the students, and petitioners' argument if accepted would validate all forms of nonideological aid to religious schools, including those explicitly rejected in our prior cases. Yet in *Meek*, we held unconstitutional the loan of instructional materials to religious schools and in *Wolman*, we rejected the fiction that a similar program could be saved by masking it as aid to individual students. *Wolman*, 433

---

[13] Petitioners also cite *Mueller* v. *Allen*, 463 U. S. 388 (1983), which upheld a general tax deduction available to parents of all schoolchildren for school expenses, including tuition to religious schools. *Mueller*, however, is quite unlike the instant case. Unlike *Mueller*, the aid provided here is unmediated by the tax code and the "numerous, private choices of individual parents of school-age children." *Id.*, at 399.

U. S., at 249, n. 16. It follows *a fortiori* that the aid here, which includes not only instructional materials but also the provision of instructional services by teachers in the parochial school building, "inescapably [has] the primary effect of providing a direct and substantial advancement of the sectarian enterprise." *Id.*, at 250. Where, as here, no meaningful distinction can be made between aid to the student and aid to the school, "the concept of a loan to individuals is a transparent fiction." *Wolman* v. *Walter, supra,* at 264 (opinion of POWELL, J.).

Petitioners also argue that this "subsidy" effect is not significant in this case, because the Community Education and Shared Time programs supplemented the curriculum with courses not previously offered in the religious schools and not required by school rule or state regulation. Of course, this fails to distinguish the programs here from those found unconstitutional in *Meek*. See 421 U. S., at 368. As in *Meek*, we do not find that this feature of the program is controlling. First, there is no way of knowing whether the religious schools would have offered some or all of these courses if the public school system had not offered them first. The distinction between courses that "supplement" and those that "supplant" the regular curriculum is therefore not nearly as clear as petitioners allege. Second, although the precise courses offered in these programs may have been new to the participating religious schools, their general subject matter—reading, mathematics, etc.—was surely a part of the curriculum in the past, and the concerns of the Establishment Clause may thus be triggered despite the "supplemental" nature of the courses. Cf. *Meek* v. *Pittenger*, 421 U. S., at 370–371. Third, and most important, petitioners' argument would permit the public schools gradually to take over the entire secular curriculum of the religious school, for the latter could surely discontinue existing courses so that they might be replaced a year or two later by a Community Education or Shared Time course with the same content. The average

religious school student, for instance, now spends 10% of the schoolday in Shared Time classes. But there is no principled basis on which this Court can impose a limit on the percentage of the religious schoolday that can be subsidized by the public school. To let the genie out of the bottle in this case would be to permit ever larger segments of the religious school curriculum to be turned over to the public school system, thus violating the cardinal principle that the State may not in effect become the prime supporter of the religious school system. See *Lemon* v. *Kurtzman*, 403 U. S., at 624–625.

### III

We conclude that the challenged programs have the effect of promoting religion in three ways.[14] The state-paid instructors, influenced by the pervasively sectarian nature of the religious schools in which they work, may subtly or overtly indoctrinate the students in particular religious tenets at public expense. The symbolic union of church and state inherent in the provision of secular, state-provided instruction in the religious school buildings threatens to convey a message of state support for religion to students and to the general public. Finally, the programs in effect subsidize the religious functions of the parochial schools by taking over a substantial portion of their responsibility for teaching secular subjects. For these reasons, the conclusion is inescapable that the Community Education and Shared Time programs have the "primary or principal" effect of advancing religion, and therefore violate the dictates of the Establishment Clause of the First Amendment.

Nonpublic schools have played an important role in the development of American education, and we have long recog-

---

[14] Because of this conclusion, we need not determine whether aspects of the challenged programs impermissibly entangle the government in religious matters, in violation of the third prong of the *Lemon* test. But see *Aguilar* v. *Felton, post,* p. 402.

nized that parents and their children have the right to choose between public schools and available sectarian alternatives. As THE CHIEF JUSTICE noted in *Lemon* v. *Kurtzman, supra*, at 625: "[N]othing we have said can be construed to disparage the role of church-related elementary and secondary schools in our national life. Their contribution has been and is enormous." But the Establishment Clause "rest[s] on the belief that a union of government and religion tends to destroy government and to degrade religion." *Engel* v. *Vitale*, 370 U. S., at 431. Therefore, "[t]he Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice, and that while some involvement and entanglement are inevitable, lines must be drawn." *Lemon* v. *Kurtzman, supra*, at 625. Because "the controlling constitutional standards have become firmly rooted and the broad contours of our inquiry are now well defined," *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S., at 761, the position of those lines has by now become quite clear and requires affirmance of the Court of Appeals.

*It is so ordered.*

CHIEF JUSTICE BURGER, concurring in the judgment in part and dissenting in part.

I agree with the Court that, under our decisions in *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), and *Earley* v. *DiCenso*, decided together with *Lemon*, the Grand Rapids Community Education program violates the Establishment Clause. As to the Shared Time program, I dissent for the reasons stated in my dissenting opinion in *Aguilar* v. *Felton, post*, p. 402.

JUSTICE O'CONNOR, concurring in the judgment in part and dissenting in part.

For the reasons stated in my dissenting opinion in *Aguilar* v. *Felton, post*, p. 402, I dissent from the Court's holding that the Grand Rapids Shared Time program impermissibly

advances religion. Like the New York Title I program, the Grand Rapids Shared Time program employs full-time public school teachers who offer supplemental instruction to parochial school children on the premises of religious schools. Nothing in the record indicates that Shared Time instructors have attempted to proselytize their students. I see no reason why public school teachers in Grand Rapids are any more likely than their counterparts in New York to disobey their instructions.

The Court relies on the District Court's finding that a "significant portion of the Shared Time instructors previously taught in nonpublic schools, and many of those had been assigned to the same nonpublic school where they were previously employed." *Americans United for Separation of Church and State* v. *School Dist. of Grand Rapids*, 546 F. Supp. 1071, 1078 (WD Mich. 1982). See *ante*, at 376, 387, and n. 7. In fact, only 13 Shared Time instructors have ever been employed by any parochial school, and only a fraction of those 13 now work in a parochial school where they were previously employed. App. 193. The experience of these few teachers does not significantly increase the risk that the perceived or actual effect of the Shared Time program will be to inculcate religion at public expense. I would uphold the Shared Time program.

I agree with the Court, however, that the Community Education program violates the Establishment Clause. The record indicates that Community Education courses in the parochial schools are overwhelmingly taught by instructors who are current full-time employees of the parochial school. The teachers offer secular subjects to the same parochial school students who attend their regular parochial school classes. In addition, the supervisors of the Community Education program in the parochial schools are by and large the principals of the very schools where the classes are offered. When full-time parochial school teachers receive public funds to teach secular courses to their parochial school students

under parochial school supervision, I agree that the program has the perceived and actual effect of advancing the religious aims of the church-related schools. This is particularly the case where, as here, religion pervades the curriculum and the teachers are accustomed to bring religion to play in everything they teach. I concur in the judgment of the Court that the Community Education program violates the Establishment Clause.

JUSTICE WHITE, dissenting.*

As evidenced by my dissenting opinions in *Lemon* v. *Kurtzman*, 403 U. S. 602, 661 (1971), and *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 813 (1973), I have long disagreed with the Court's interpretation and application of the Establishment Clause in the context of state aid to private schools. For the reasons stated in those dissents, I am firmly of the belief that the Court's decisions in these cases, like its decisions in *Lemon* and *Nyquist*, are "not required by the First Amendment and [are] contrary to the long-range interests of the country." 413 U. S., at 820. For those same reasons, I am satisfied that what the States have sought to do in these cases is well within their authority and is not forbidden by the Establishment Clause. Hence, I dissent and would reverse the judgment in each of these cases.

JUSTICE REHNQUIST, dissenting.

I dissent for the reasons stated in my dissenting opinion in *Wallace* v. *Jaffree*, 472 U. S. 38 (1985). The Court relies heavily on the principles of *Everson* v. *Board of Education*, 330 U. S. 1 (1947), and *McCollum* v. *Board of Education*, 333 U. S. 203 (1948), *ante*, at 381–382, 390, 391, 392, but de-

---

*[This opinion applies also to No. 84–237, *Aguilar et al.* v. *Felton et al.*, No. 84–238, *Secretary, United States Department of Education* v. *Felton et al.*, and No. 84–239, *Chancellor of the Board of Education of the City of New York* v. *Felton et al., post*, p. 402.]

clines to discuss the faulty "wall" premise upon which those cases rest. In doing so the Court blinds itself to the first 150 years' history of the Establishment Clause.

The Court today attempts to give content to the "effects" prong of the *Lemon* test by holding that a "symbolic link between government and religion" creates an impermissible effect. *Ante*, at 385. But one wonders how the teaching of "Math Topics," "Spanish," and "Gymnastics," which is struck down today, creates a greater "symbolic link" than the municipal crèche upheld in *Lynch* v. *Donnelly*, 465 U. S. 668 (1984), or the legislative chaplain upheld in *Marsh* v. *Chambers*, 463 U. S. 783 (1983).

A most unfortunate result of this case is that to support its holding the Court, despite its disclaimers, impugns the integrity of public school teachers. Contrary to the law and the teachers' promises, they are assumed to be eager inculcators of religious dogma, see *ante*, at 387–389, requiring, in the Court's words, "ongoing inspection." *Aguilar* v. *Felton, post*, at 412; see *ante*, at 387–389. Not one instance of attempted religious inculcation exists in the records of the school-aid cases decided today, even though both the Grand Rapids and New York programs have been in operation for a number of years. I would reverse.